## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal Action No. 10-106 (-2, 5) (RMC) |
| | ) |
| FRANCISCO JOSE VALDERRAMA | ) |
| CARVAJAL and LUIS ALBERTO | ) |
| MUNOZ MIRANDA, | ) |
| | ) |
| Defendants. | ) |

_____  )

## OPINION

I. FACTS ............................................................................................................................. 2
  A. Procedural History ........................................................................................................ 2
  B. The Drug Trafficking Organization and Planned November 2006 Loads ................... 4
  C. Caribbean Maritime Geography .................................................................................. 8
II. LEGAL STANDARD ..................................................................................................... 10
III. ANALYSIS ..................................................................................................................... 11
  A. Maritime Drug Law Enforcement Act ...................................................................... 12
    1. 1980s Enactment and Legislative History ............................................................. 12
    2. 1986 Version ........................................................................................................... 14
    3. Present Version ........................................................................................................ 15
  B. Maritime Definitional Issues ..................................................................................... 16
  C. Factual Issues—Statelessness & High Seas Travel .................................................. 19
    1. Statelessness of Vessel ............................................................................................ 19
    2. Travel through the High Seas .................................................................................. 24
  D. Statutory Subject Matter Jurisdiction ....................................................................... 27
    1. Extraterritorial Application ..................................................................................... 27
    2. *Charming Betsy* ...................................................................................................... 29
    3. Whether MDLEA Requires Conspiring "On Board" a Vessel ............................... 34
    4. Whether MDLEA Requires a Nexus to the United States ...................................... 37
    5. Whether Colombia's Consent Was Required .......................................................... 38
    6. Conclusion ............................................................................................................... 43
  E. Constitutionality of MDLEA as Applied .................................................................. 43
    1. Legal Standard—Constitutionality ......................................................................... 44
    2. The Treaty Power .................................................................................................... 45
    3. Article I, Section 8, Clause 10: The Power . . . To define and punish Piracies and
    Felonies committed on the high Seas, and Offences against the Law of Nations . . . .......... 47
  F. Due Process ................................................................................................................ 64
IV. CONCLUSION ............................................................................................................... 69

This prosecution under the Maritime Drug Law Enforcement Act (MDLEA) is a product of the escalation of a battle.  On one side are international drug traffickers, who constantly refine their methods for transporting illegal narcotics from country to country.  On the other side is law enforcement, which must adapt its efforts to halt the illicit drug trade, a task made all the more difficult in an increasingly globalized world.  In this case, the United States seeks to hold drug traffickers criminally responsible in circumstances not previously addressed by the courts.

This case may be at the outskirts of Congress's power to criminalize extraterritorial conduct.  The two Defendants, Luis Alberto Munoz Miranda and Francisco Jose Valderrama Carvajal, were Colombian-based members of an international drug trafficking conspiracy.  They admitted involvement in a conspiracy to use vessels with no registration and nationality, commonly referred to as "stateless vessels," to transport cocaine from Colombia to a rendezvous point in the seas near Honduras.  Two stateless vessels are involved in this case.  One never left the dock; the other was seized by the Colombian Navy after traveling a significant distance at sea.  The latter vessel was captured after it ran aground on an island that belongs to Colombia, so it was seized by Colombian authorities in Colombian territorial waters.  The United States, prosecuting through the Department of Justice, does not claim that it can show that the cocaine recovered from the captured vessel was destined for this country, and it concedes that Messrs. Munoz Miranda and Valderrama Carvajal never left the *terra firma* of Colombia at any relevant point prior to being extradited to the United States years after the stateless vessel and its crew were seized and prosecuted by Colombia.

Defendants contest the constitutionality of applying MDLEA to foreign citizens, acting in a foreign country, who never set foot on a vessel transporting narcotics.  Many cases

have upheld MDLEA as a valid exercise of congressional power and have denied due process challenges, but with varying analyses. Few cases have involved prosecutions deriving from vessels seized in a foreign country's territorial waters, whether those vessels were registered in a foreign country or were stateless. Equally rare are MDLEA prosecutions of individuals whose personal involvement took place exclusively within a foreign country's territory. This case fits both of those categories, which the Court understands to be a factually unprecedented scenario.

The Court must determine whether this prosecution is constitutional. While it may be a close question, it is one the Court resolves in DOJ's favor.

## I. FACTS

### A. Procedural History

Along with three other co-defendants,[1] Messrs. Munoz Miranda and Valderrama Carvajal were charged by Indictment filed April 23, 2010 with conspiracy to distribute five kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States in violation of the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. §§ 70503, 70506(b) and 18 U.S.C. § 2. *See* Indictment [Dkt. 3]. DOJ filed a Superseding Indictment on August 25, 2010, containing the same charge. *See* Superseding Indictment [Dkt. 6]. Bench warrants were issued for all Defendants. Messrs. Munoz Miranda and Valderrama Carvajal were arrested in Colombia by the Colombian national police on May 12, 2011 and extradited to the United States. *See* Extradition Orders, Dkt. 60, Ex. E [Dkt. 60-5]. Mr. Munoz Miranda made his initial appearance before a magistrate judge on February 27, 2012, and Mr. Valderrama Carvajal made his first appearance on April 20, 2012.

---

[1] Two of the co-defendants, Jorge Castro Sanchez and Francisco Vergara Neri, are fugitives and have not appeared in court. The fifth co-defendant, Jorge Alberto Garcia Jaramillo, has not joined in any of the instant motions.

Both Defendants filed numerous motions prior to their scheduled October 15, 2012, trial date, raising various arguments against MDLEA's constitutionality and as to whether MDLEA encompasses the allegations made in this case.[2]  Both DOJ and the Defendants filed numerous briefs, and the Court held a motions hearing on October 11, 2012 to address the arguments advanced by Messrs. Munoz Miranda and Valderrama Carvajal.

By agreement of all parties, DOJ proceeded by evidentiary proffer and the Court heard oral arguments only.  After extensive and articulate debate from Defendants' counsel and DOJ, the Court denied the motions to dismiss.  Although it noted that the motions presented close questions on which courts had written little, the Court held that MDLEA could be constitutionally applied to the facts in this case.  Because Messrs. Munoz Miranda and Valderrama Carvajal immediately stated that they wished to enter into plea agreements with DOJ, there was never a full written opinion, although the Court had summarized its reasoning from the bench.

The following day, October 12, 2012, both Defendants entered guilty pleas to a Superseding Information, Dkt. 71, charging them each with one count of conspiracy to distribute five hundred grams or more of cocaine on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506(b), and 21 U.S.C. § 960(b)(2)(B).  Both Defendants' pleas were reliant on Fed. R. Civ. P. 11(c)(1)(C) and stipulated to sentences of five years' imprisonment.  *See* Plea Agr. (Munoz Miranda) [Dkt. 72] ¶ 8; Plea Agr. (Valderrama Carvajal) [Dkt. 76] ¶ 8.  Sentencing hearings were scheduled for November 29, 2012.

---

[2] Mr. Munoz Miranda sought at one point to withdraw from these motions in anticipation of entering a non-trial disposition, but later rejoined all of the motions discussed in this Opinion, including the motions for reconsideration.

Before sentencing, however, Messrs. Munoz Miranda and Valderrama Carvajal filed motions for reconsideration of the Court's denial of their motions to dismiss. *See* [Dkts. 86, 87]. The motions for reconsideration depend in large part on an Eleventh Circuit decision issued on November 6, 2012, holding that MDLEA is unconstitutional as applied in that case because Congress lacks the power to criminalize the charged conduct. *See United States v. Bellaizac-Hurtado*, 700 F.3d 1245 (11th Cir. 2012). This Court continued sentencing until the motions for reconsideration could be resolved. Noting that the United States had raised a novel jurisdictional argument in its petition for rehearing *en banc* in the Eleventh Circuit—that MDLEA is constitutional as an exercise of Congress's power to implement treaties—the Court ordered further briefing on that issue. *See* Minute Order dated Jan. 17, 2013.

### B. The Drug Trafficking Organization and Planned November 2006 Loads

Along with other individuals in Colombia and Mexico, Messrs. Munoz Miranda and Valderrama Carvajal were co-conspirators in a drug trafficking organization (DTO) that, "from in or about 2006 and continuing until August 25, 2010, transported narcotics from Colombia on stateless go-fast vessels through international waters to other countries." Joint Statement of Stipulated Facts as to Defendant Munoz Miranda ("Munoz Miranda SoF") [Dkt. 73] ¶ 3; Joint Statement of Stipulated Facts as to Defendant Valderrama Carvajal ("Valderrama Carvajal SoF") [Dkt. 77] ¶ 3.[3] The DTO provided cocaine to a drug trafficking organization in Mexico headed by a man named Jorge Castro. Dkt. 60, Ex. D [Dkt. 60-4], Affidavit of Agent

---

[3] Both defendants entered guilty pleas after their motions to dismiss were denied and both have moved for reconsideration on the Court's jurisdiction, not to withdraw their guilty pleas. Each defendant acknowledged the truth of his joint statement of stipulated facts under oath at the plea proceeding. The Court thus treats the facts stipulated by both defendants as admitted for the purposes of evaluating the instant motions. *See generally* Fed. R. Evid. 410 (governing admissibility of pleas, plea discussions, and related statements).

Christopher Jakim, at 3–4.[4]  Defendant Valderrama Carvajal was "the organizer in the Jorge

Castro [DTO] and the bridge between the transportation network in Colombia and the cocaine

purchaser in Mexico."  *Id.*  Defendant Munoz Miranda "assisted with logistics, as well as with

obtaining and delivering maritime supplies and reports to ensure that the cocaine arrived at its

planned destination without law enforcement detection."  *Id.*

---

[4] The Court refers to the parties' briefs by their docket numbers to avoid confusion from the
large number of filings, most of which have similar names that do not identify the specific
arguments made therein.  The filings are:

Defendants:
- Joint Motion to Dismiss for Lack of Jurisdiction of the United States [Dkt. 34]
- Reply to Government's Opposition to Defendant's Motion to Dismiss for Lack of
  Jurisdiction of the United States [Dkt. 51]
- Defendants' Motion to Dismiss the Indictment [Dkt. 53]
- Joint Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction [Dkt. 54]
- Reply to Government's Omnibus Response [Dkt. 61]
- Defendants' Reply to Section H of Government's Omnibus Response to Defendants'
  Motion to Dismiss [Dkt. 65]
- Motion for Reconsideration of the Court's Denial of the Defendant's Motion to Dismiss
  Indictment for Lack of Subject Matter Jurisdiction [Dkt. 84]
- Joint Motion for Reconsideration of Defendants' Motions to Dismiss [Dkt. 85]
- Defendants' Reply to Government's Response to Motion to Reconsider Defendants'
  Motion to Dismiss [Dkt. 91] (duplicate at [Dkt. 93])
- Reply to Government's Opposition, ECF #89 [Dkt. 96]
- Defendants' Reply to Government's Response to Court's Minute Order Dated January
  17, 2013 [Dkt. 99]

Government:
- Government's Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction of
  the United States [Dkt. 47]
- Government's Opposition to Defendants' Motion to Dismiss the Indictment—Failure to
  State a Crime and Joint Motion to Dismiss Indictment for Lack of Subject Matter
  Jurisdiction [Dkt. 60]
- Government's Opposition to Defendants' Joint Motion for Reconsideration of
  Defendants' Motions to Dismiss [Dkt. 88]
- Government's Opposition to Defendants' Motion for Reconsideration of the Court's
  Denial of the Defendants' Motion to Dismiss Indictment for Lack of Subject Matter
  Jurisdiction [Dkt. 89]
- Government's Response to Court's January 17, 2013 Minute Order [Dkt. 98]

During November 2006, "pursuant to a lawfully authorized interception order, Colombia law enforcement officers were listening to telephone calls of some of the conspirators in this case.  Based on the intercepted calls, the officers concluded that the Defendants were planning to move a large load of cocaine from the north coast of Colombia."  Dkt. 60 at 2; *see also* Dkt. 60, Ex. C [Dkt. 60-3] (Wiretap Transcriptions).

The DTO's intended November 2006 shipment involved at least two separate loads.  For both shipments, the DTO planned to use a go-fast boat, a term used by Coast Guard officials to refer to vessels that "can travel at high rates of speed, which makes them a favored vehicle for drug and alien smuggling operations."  *United States v. Tinoco*, 304 F.3d 1088, 1092 (11th Cir. 2002).  The vessels were to transport cocaine from the north coast of Colombia that was "to be ultimately delivered to a co-defendant in Mexico."  Munoz Miranda SOF ¶ 3; Valderrama Carvajal SOF ¶ 5.  The go-fast boat for the first shipment, which "was not registered in Colombia and did not fly a Colombian flag," "was standing by with a crew and was ready to transport the cocaine."  Munoz Miranda SOF ¶ 3; *see also* Valderrama Carvajal SOF ¶ 5.  "However, the day before the cocaine was to be loaded on the go-fast boat, the cocaine was stolen from the custody of others who had been entrusted with the cocaine . . . ."  Munoz Miranda SOF ¶ 3.  The DTO's efforts to recover the stolen load were fruitless.  *Id.*

A different shipment of approximately 2000 kilograms of cocaine was successfully loaded aboard a go-fast vessel that left Colombia's north coast on November 16, 2006.  Valderrama Carvajal SOF ¶ 5.[5]  Neither Mr. Munoz Miranda nor Mr. Valderrama

---

[5] The facts regarding the November 16, 2006 shipment do not appear in Mr. Munoz Miranda's Joint Statement of Stipulated Facts, but DOJ's theory of the case has been that both defendants were complicit in planning and arranging both shipments. *E.g.*, Dkt. 60 at 2.  Mr. Munoz Miranda has not argued that this asymmetry in the factual proffers is in any way relevant to the motions before the Court.

Carvajal was aboard; instead, the boat was crewed by five Colombians who were hired by various intermediaries. *See* Crew Statements, Dkt. 60, Ex. B [Dkt. 60-2]. The vessel was a "launch with a dark blue hull," "shaped like a large racing boat," "about 40 feet in length," and equipped with three Yamaha 200-horsepower motors. Dkt. 60 at 2; Statement of Colombian Naval Lieutenant Gustavo Adolfo Espinosa Redondo, Dkt. 60, Ex. A [Dkt. 60-1], at 3. The go-fast boat flew no flag, was not registered in Colombia or any other country, and carried no registration information. Valderrama Carvajal SOF ¶ 3.

The go-fast boat "headed towards the San Andres Islands, and was to rendezvous with another vessel near the coast of Honduras, where the cocaine would be transferred to the other vessel." Dkt. 60 at 2; *see also* Valderrama Carvajal SOF ¶ 3 ("The captain of the go-fast boat admitted . . . that the cocaine was to be offloaded onto another vessel near the coast of Honduras."). The precise path taken by the go-fast vessel is unknown, as discussed below.

On November 18, 2006, "the Colombia Navy and Air Force intercepted the go-fast vessel near Roncador Island, a tiny, essentially uninhabited rock island" that belongs to Colombia and is also sometimes called Roncador Cay; following a brief chase, the go-fast vessel ran aground on Roncador. Dkt. 60 at 3; *see also* Valderrama Carvajal SOF ¶ 3. The Colombian Navy arrested the five crewmembers. Valderrama Carvajal SOF ¶ 3. One of the crew members identified himself as the captain. *Id.* None of the crew members claimed Colombian registry for the vessel. *Id.* When the Colombian Navy personnel inquired as to "where the papers were that proved the ownership of the launch and the motors," the crew responded that "it had no papers and that they did not know who the owner was and that they knew no one, that they were simply hired to go find a fishing boat in that area named SI SE PUEDE that was supposedly adrift." Statement of Lt. Espinosa Redondo at 3. The Colombian Navy recovered cocaine from the go-

fast vessel and the ocean.  Dkt. 60 at 3.  The search also uncovered approximately twenty 55-

gallon gasoline drums; no other documents and "[n]o other item such as GPS, cellular phones, or

two-way radios were found, because the captain told [the Colombian Navy] that the person who

had been carrying the knapsack containing the equipment had dropped it in the water."

Statement of Lt. Espinosa Redondo at 3.

### C.  Caribbean Maritime Geography

Understanding the geography at issue in this case is useful to the following

discussion.  There is an historical dispute between Nicaragua and Colombia as to ownership of

the seas and islands in the area, referred to as the San Andres Islands.  The parties do not dispute

where the territories and seas are located, and they agree on a beginning point and an endpoint

for the go-fast vessel: (1) it left from some port on the northern coast of Colombia, and (2) it

ended up aground on Roncador.  The International Court of Justice prepared a sketch of the area

in question, referred to as "Map A."  Roncador appears in the upper center of the map.



*Territorial & Maritime Dispute (Nicaragua v. Colombia)*, 2012 I.C.J. No. 124 ("*ICJ Decision*"),

at 64.  The shaded area shows Roncador and other scattered islands, not land.

   "Roncador is an atoll located on a bank 15 km long and 7 km wide.  It is about

190 nautical miles to the east of the mainland of Nicaragua, 320 nautical miles from the

mainland of Colombia, 75 nautical miles east of the island of Providencia and 45 nautical miles

from Serrana.  Roncador Cay, located half a mile from the northern border of the bank, is some

550 metres long and 300 metres wide."  *ICJ Decision* ¶ 24(c).  This Court takes judicial notice of

the geography depicted in Map A and as explained in the ICJ's ruling.  *See* Fed. R. Evid. 201.

   The dispute between Nicaragua and Colombia over the ownership of the islands

depicted in Map A has its origin in the eighteenth century.  The countries tried to settle the

matter through a treaty in 1928, but Nicaragua renounced the treaty in the 1980s and claimed that

the islands belonged to it. "UN ruling gives Colombia islets but Nicaragua more sea," BBC,

Nov. 19, 2012, *available at* http://www.bbc.co.uk/news/world-latin-america-20391180 (last

accessed Feb. 19, 2013) ("BBC Article").   In 2007, a preliminary ICJ decision held that three of

the biggest islands in the archipelago belonged to Colombia.   *Id.*   In the November 2012 ruling,

the ICJ upheld Colombia's claim to all of the islands in question, including Roncador.   *See* ICJ

Decision ¶ 103.   The parties have briefed this case on the assumption that Roncador belongs to

Colombia, so the ICJ's ruling does not change matters.   The ICJ also determined the rights of

Nicaragua and Colombia with respect to the waters surrounding the islands.   This issue is

discussed in the context of other maritime definitional issues below.

## II.  LEGAL STANDARD

"[A]t any time while the case is pending, the court may hear a claim that the

indictment or information fails to invoke the court's jurisdiction or to state an offense."  Fed. R.

Crim. P. 12(b)(3)(B).   The jurisdiction of a United States court under MDLEA "is not an element

of an offense," and jurisdictional issues in MDLEA prosecutions are "preliminary questions of

law to be determined solely by the trial judge."   46 U.S.C. § 70504; *see also United States v.*

*Mitchell-Hunter*, 663 F.3d 45, 51 (1st Cir. 2011) ("[T]he purpose of the MDLEA's jurisdictional

requirement is not to protect a defendant's rights, but instead to maintain comity between foreign

nations . . . .").[6]   Courts have required the government to establish jurisdiction by a

preponderance of the evidence, *e.g.*, *United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010),

and the Court imposes that standard here.

---

[6] Current § 70504 was added to MDLEA in 1996.  *See* Coast Guard Authorization Act of 1996,
Pub. L. 104-324, § 1138(a)(5), 110 Stat. 3901.  Prior courts had held that jurisdiction was an
element of the offense to be determined by the jury.  *See United States v. Moreno-Morillo*, 334
F.3d 816, 828–29 (9th Cir. 2003) (discussing effect of 1996 amendment).  Courts have upheld
the constitutionality of the delegation to the trial judge to rule on the motion to dismiss.  *E.g.*,
*United States v. Tinoco*, 304 F.3d 1088, 1104–12 (11th Cir. 2002).

Other judges of this Court have addressed whether motions to reconsider are properly entertained in criminal cases and, if so, what standards govern. *See United States v. Bloch*, 794 F. Supp. 2d 15, 18–19 (D.D.C. 2011) ("In sum, while judges of this court have, on occasion, entertained motions for reconsideration of interlocutory orders in criminal cases, no Federal Rule of Criminal Procedure, or Local Criminal Rule of the United States District Court for the District of Columbia, provides for such motions."). This Court, like others, *e.g.*, *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009), assumes that such motions are available but need not resolve the issue for two reasons. First, and most importantly, Messrs. Munoz Miranda and Valderrama Carvajal challenge the Court's jurisdiction. Second, the motions provide the Court with an opportunity to amplify its oral ruling for appeal in a case of first impression. To that extent, the motions addressed herein are essentially the original motions to dismiss. Justice is best served if the Court considers the claims advanced by the Defendants, however styled. *See id.* (applying "as justice requires" standard to similar motion for reconsideration after denial of motion to dismiss).

## III.  ANALYSIS

Messrs. Munoz Miranda and Valderrama Carvajal raise multiple jurisdictional challenges to their prosecutions. Many of their arguments overlap issues that are analytically distinct. The small-but-growing body of MDLEA case law has evolved over time, has interpreted a statute that has been amended on numerous occasions, and has addressed a number of legal questions that can be difficult to separate. This Court attempts to distinguish and treat each legal issue separately.

The Court first reviews the statute, discussing the provisions and history necessary to understand the issues presented here and to read prior MDLEA decisions correctly. Next, the Court addresses a number of factual matters that must be determined before reaching

the Defendants' legal arguments, including the status of the vessel seized by the Colombian

Navy, what constitutes the "high seas," and whether this particular go-fast vessel traveled on the

high seas.  Third, the Court addresses statutory subject matter jurisdiction, considering whether

MDLEA applies to the facts of this case.  The constitutionality of MDLEA as applied is

addressed fourth.  Finally, the Court considers whether the prosecution of Messrs. Munoz

Miranda and Valderrama Carvajal comports with due process.

### A.  Maritime Drug Law Enforcement Act

#### 1. 1980s Enactment and Legislative History

In 1980, Congress enacted what would later become MDLEA as part of

legislation "to facilitate increased enforcement by the Coast Guard of laws relating to the

importation of controlled substances."  §§ 1–4, Pub. L. 96-350, 94 Stat. 1159.  The first version

of the statute was codified at 21 U.S.C. 955a *et seq.*, and the earliest cases interpreting the

statutory language of MDLEA—those from the early 1980s—cite to this statute.  MDLEA itself

was enacted as §§ 3201–02 of the Anti-Drug Abuse Act of 1986 and codified at 46 U.S.C. app.

§ 1901 *et seq.  See* Pub. L. 99-570, 100 Stat. 3207.  In 2006, the MDLEA was moved to its

present location at 46 U.S.C. § 70501 *et seq.* without any amendment relevant to this case.  *See*

Act of Oct. 6, 2006, § 10(2), Pub. L. 109-304, 120 Stat. 1485.

According to the legislative history, the 1980 legislation was enacted to "facilitate

enforcement by the Coast Guard of laws relating to the importation of illegal drugs and other

purposes."  S. Rep. No. 96-855, 1980 U.S.C.C.A.N. 2785, 2785 (July 16, 1980).  The Coast

Guard had faced difficulty because the Comprehensive Drug Abuse Prevention and Control Act

of 1970 inadvertently "repeal[ed] the criminal provision under which drug smugglers

apprehended on the high seas were prosecuted without creating a new provision to replace it."

*Id.*  The repeal created a "statutory void" because if the government wished to prosecute

offenders seized on the high seas, it had to prosecute conspiracy or attempt to import narcotics. *Id.* at 2785–86.  However, "in most cases, evidence to prove importation or conspiracy beyond a reasonable doubt [was] impossible to obtain."  *Id.*  Accordingly, although the Coast Guard could "seize and confiscate the ship and the illegal drugs," it could not "prosecute the crew or others involved in the smuggling operation," creating a situation in which there was "little deterrent effect on the crews or the trafficking organizations in the highly lucrative trade in illegal drugs" because the organizations considered occasional seizures "part of the cost of doing business."  *Id.* at 2786.  The Senate Report also states that the 1980 legislation was intended to "give the Justice Department the maximum prosecutorial authority permitted under international law" and "to address acts committee [sic] outside the territorial jurisdiction of the United States."  *Id.; see also id.* (MDLEA "would apply to prohibited acts even if such acts occurred outside the territorial jurisdiction of the United States").  The statute explicitly stated that it would apply extraterritorially because some courts declined to give statutes extraterritorial effect without an explicit statement from Congress.  *Id.*

The 1980 version of the statute contained provisions nearly identical to those under which Messrs. Munoz Miranda and Valderrama Carvajal are charged.  The statute provided: "[I]t is unlawful for any person . . . on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance," 21 U.S.C. § 955a(a), and it extended its reach to "[a]ny person who attempts or conspires to commit any offense defined in this Act," *id.* § 955c.  The statute made clear that it was "intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."  *Id.* § 955a(h).

## 2. 1986 Version

The version of MDLEA enacted in 1986 is very similar to the version in effect today, apart from its different location in the United States Code.  *See* 46 U.S.C. App. §§ 1902–03.  The statute was moved to its present location at 46 U.S.C. § 70501 *et seq.* in 2006.  Importantly, the predecessors of the sections with which Messrs. Munoz Miranda and Valderrama Carvajal are charged included substantially the same statutory text as the present versions, making reliance on cases from 1986 to 2006 feasible even though they cite to a different section of the United States Code.  *See* 46 U.S.C. App. § 1903(a) (2002) ("It is unlawful for any person . . . on board a vessel subject to the jurisdiction of the United States . . . to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance."); *id.* § 1903(c)(1)(A) ("[A] 'vessel subject to the jurisdiction of the United States' includes a vessel without nationality . . ."); *id.* § 1903(j) ("Any person who attempts or conspires to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense . . .").  However, it bears noting that the "on the high seas" language present in the 1980 version was omitted from the 1986 version.  *Compare* 21 U.S.C. § 955a(a) (1980) ("[I]t is unlawful for any person . . . on board a vessel subject to the jurisdiction of the United States *on the high seas*, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance . . . ." (emphasis added)), *with* 46 U.S.C. App. § 1903(a) (2002) ("It is unlawful for any person . . . on board a vessel subject to the jurisdiction of the United States . . . to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.").

### 3.  Present Version

The present version of MDLEA retains as a preamble from the 1986 version a statement that "Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States . . . ."  46 U.S.C. § 70501(1).

Messrs. Munoz Miranda and Valderrama Carvajal are charged with violating 46 U.S.C. §§ 70503(a)(1) & 70506(b).  The substantive offense provision, § 70503(a)(1), provides: "An individual may not knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board a vessel of the United States or a vessel subject to the jurisdiction of the United States . . . ."  Furthermore,  § 70506(b) provides that "[a] person attempting or conspiring to violate section 70503 of this title is subject to the same penalties as provided for violating section 70503."

As to extraterritorial application, MDLEA states explicitly that § 70503(a) "applies even though the act is committed outside the territorial jurisdiction of the United States."  *Id.* § 70503(b). Moreover, the statute provides that individual defendants charged with violating MDLEA have no standing to raise an international-law violation as a defense:

> A person charged with violating section 70503 of this title . . . does not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law in the enforcement of this chapter may be made only by a foreign nation. A failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter.

*Id.* § 70505.

A "vessel subject to the jurisdiction of the United States" is defined in 46 U.S.C. § 70502(c), which provides:

(1) . . . [T]he term "vessel subject to the jurisdiction of the United States" includes—

    (A) a vessel without nationality;

    . . .

    (C) a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States;

    (D) a vessel in the customs waters of the United States;

    (E) a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States . . . .

(2) Consent or waiver of objection.—Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under paragraph (1)(C) or (E)—(A) may be obtained by radio, telephone, or similar oral or electronic means; and (B) is proved conclusively by certification of the Secretary of State or the Secretary's designee.

The statute and case law further define "vessel without nationality," as discussed below.

## B.  Maritime Definitional Issues

For purposes of a ruling here, the Court must determine the meaning of "the high seas" as used in the United States Constitution Article I § 8, clause 10, which provides that Congress is empowered "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  Complicating matters is that the terminology for bands of water at differing ranges from a nation's coast is complex and not uniform.  The following terms are relevant to the instant analysis:

<u>Customs Waters</u>: Refers to "three miles of water from any point of land out to sea." *United States v. Ledesma-Cuesta*, 347 F.3d 527, 530 n.3 (3d Cir. 2003).  "[I]n the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the

United States enabling or permitting the authorities of the United States to board, examine,

search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United

States, [customs waters are] the waters within such distance of the coast of the United States as

the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in

the case of every other vessel, the waters within four leagues of the coast of the United States."

19 U.S.C. § 1401(j).

           <u>Territorial Waters or Territorial Seas</u>: Refers to twelve miles of water from any

point of land of any country out to sea.  *Ledesma-Cuesta*, 347 F.3d at 530 n.3.  "[I]nternational

law today sets the breadth of the territorial sea which the coastal State has the right to establish at

12 nautical miles.  . . .  Colombia has established a 12-nautical-mile territorial sea in respect of

all its territories."  *ICJ Decision* ¶ 177; *see also id.* ¶ 178 (discussing how the Court of

Arbitration and International Tribunal on the Law of the Sea have reached the same result

regarding the extent of territorial seas); 1982 United Nations Convention on the Law of the Sea

(UNCLOS), opened for signature Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16,

1994), Art. 3.  "In accordance with long-established principles of customary international law, a

coastal State possesses sovereignty over the sea-bed and water column in its territorial sea."  ICJ

Decision ¶ 177 (citation omitted).  The ICJ's 2012 decision included a finding that Roncador is

entitled to a twelve-mile territorial sea.  *Id.* ¶ 180.

           <u>Exclusive Economic Zone (EEZ) and Continental Shelf</u>:  Exclusive Economic

Zone refers to two-hundred miles of water from the baseline of a coastal state, UNCLOS Art. 57,

and the Continental Shelf is "the seabed and subsoil of the submarine areas that extend beyond

its territorial sea throughout the natural prolongation of its land territory to the outer edge of the

continental margin, or to a distance of 200 nautical miles from the baselines from which the

breadth of the territorial sea is measured where the outer edge of the continental margin does not

extend up to that distance," *id.* Art. 76.  "States enjoy specific rights, rather than sovereignty,

with respect to the continental shelf and exclusive economic zone." *ICJ Decision* ¶ 177.   In its

2012 ruling, the ICJ set out a line of maritime delimitation to divide the continental-shelf and

EEZ rights of Colombia and Nicaragua.  *See ICJ Decision* ¶¶ 184–247; *see also id.* Map no. 11

(illustrating maritime boundary fixed by the ICJ).  This ruling has upset Colombia because its

EEZ has been reduced in size and because two of its islands—Roncador not among them—are

now surrounded by waters in the Nicaraguan EEZ, notwithstanding the 12-mile territorial sea

around them belonging to Colombia.  *See* Jim Wyss, "World court: Colombia loses swath of sea

but keeps islands in dispute with Nicaragua," Miami Herald, Nov. 19, 2012, available at

http://www.miamiherald.com/2012/11/19/3104915/world-court-colombia-loses-swath.html (last

accessed Feb. 20, 2012).

   The High Seas: Courts treat "the high seas" as the waters *not* within any nation's

territorial seas—i.e., the high seas are the waters beyond the coastal state's sovereignty, meaning

those greater than twelve miles from the coast.  *E.g.*, *United States v. Romero-Galue*, 757 F.2d

1147, 1149 (11th Cir. 1985) (MDLEA case) (citing *United States v. Williams*, 617 F.2d 1063,

1073 n.6 (5th Cir. 1980) (*en banc*); other citations omitted); *see also* Convention on the High

Seas, Sept. 30, 1962, art. 1, 13 U.S.T. 2312 ("The term 'high seas' means all parts of the sea that

are not included in the territorial sea or in the internal waters of a State."); *In re Air Crash Off*

*Long Island, New York, on July 17, 1996*, 209 F.3d 200, 205 (2d Cir. 2000) (surveying United

States and international law on meaning of "high seas" and concluding that the "high seas" are

those outside territorial waters).[7]

### C. Factual Issues—Statelessness & High Seas Travel

Before turning to issues of statutory subject matter jurisdiction, constitutionality,

and due process, the Court makes two findings of fact that guide its legal analysis: (1) the vessel

seized by the Colombian Navy off Roncador and the vessel planned to transport the stolen load

were "stateless vessels" subject to United States jurisdiction under 46 U.S.C. § 70502(c)(1), (d);

and (2) the vessel seized by the Colombian Navy traveled on the high seas before being seized

off Roncador in the territorial waters of Colombia.

### 1. Statelessness of Vessel

DOJ relies on the theory that the vessels were "without nationality" and thus

subject to United States jurisdiction under 42 U.S.C. §§ 70502(c)(1), (d).  *See* Dkt. 47 at 2.  For

the reasons set forth below, the Court finds that both vessels were "without nationality."

A "'vessel subject to the jurisdiction of the United States' includes a vessel

without nationality."  46 U.S.C. § 70502(c)(1)(A).  MDLEA in turn defines a "vessel without

nationality" to include three different categories of vessels.  46 U.S.C. § 70502(d)(1).  Those

categories are:

---

[7] There is some authority that the "high seas" begin outside the 200-mile economic zone.  *See, e.g.,* UNCLOS Art. 86.  The Court declines to adopt that definition; defining the "high seas" as those waters beyond any country's sovereignty is the better reasoned understanding that has long been in use.  *E.g.,* *United States v. Morel*, 26 F. Cas. 1310, 1312 (C.C.E.D. Pa. 1834) (No. 15,807) ("The open sea, the high sea, the ocean, is that which is . . . under the particular right or jurisdiction of no sovereign . . . ."); *see also United States v. Salad*, __ F. Supp. 2d __, Cr. No. 2:11cr34, 2012 WL 6097444, at *3–4 (E.D. Va. Nov. 30, 2012) (rejecting argument that Somalia is entitled to 200-mile territorial sea because "the twelve-mile [territorial sea] limit accurately describes customary international law").

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;

(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and

(C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

*Id.* Moreover, MDLEA limits to three the ways in which a vessel can make a "claim of nationality or registry" in 46 U.S.C. § 70502(e):

A claim of nationality or registry under this section *includes only*—

(1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;

(2) flying its nation's ensign or flag; or

(3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

(emphasis added).

Because MDLEA's list of what constitutes a "vessel without nationality" is not exhaustive, *see* 46 U.S.C. § 70502(d)(1) ("the term 'vessel without nationality' *includes* . . ." (emphasis added)), courts have held that MDLEA's definition of a "vessel without nationality" also encompasses vessels considered "stateless" or "without nationality" under international law. *See United States v. Rosero*, 42 F.3d 166, 171 (3d Cir. 1994) ("T]he residual category of vessels 'without nationality' [in the MDLEA] . . . are those that would be regarded as without nationality or stateless under international law."); *see also United States v. Henriquez*, 731 F.2d 131, 134 n.5 (2d Cir. 1984) ("[T]he term 'vessel without nationality' clearly encompasses vessels not

operating under the authority of any sovereign nation.").  Essentially, "the core of the concept of a vessel that is 'without nationality' or stateless is that the vessel lacks authorization to fly the flag of any recognized state."  *Rosero*, 42 F.3d at 171.

Both Messrs. Munoz Miranda and Valderrama Carvajal conceded in their factual proffers that both vessels the DTO used in this case were stateless.  *See* Munoz Miranda SOF ¶ 3 ("[The DTO] . . . transported narcotics from Colombia on stateless go-fast vessels . . . ."); Valderrama Carvajal SOF ¶¶ 3 (same).

However, the Defendants had argued prior to entering guilty pleas that statelessness was unresolved as a factual matter.  *See* Dkt. 34 at 3 ("[I]t appears the Colombian Navy believed the vessel was Colombian as it asserted its jurisdiction over the vessel.  There is no evidence that the Colombian Navy questioned or considered the nationality of the vessel to be anything other than Colombian."); *see also* Dkt. 61 at 8–9, 10 ("[T]he 'statelessness of the vessel' has in fact not been proven.").   They speculate that, prior to the seizure in Colombian territorial waters, "there may well have been aboard the boat at some point documents relating to the nationality of the vessel. . . . [H]ad the vessel . . . been seized on the high seas, it may have very well maintained 'documents' on board," asserted a claim of nationality when seized, or carried a flag. Dkt. 51 at 5.  In their motions for reconsideration, Defendants also raised a legal argument: the vessels cannot have been stateless because "[u]nder international law, only a vessel in international waters[ ] can be 'stateless' or without nationality."  Dkt. 91 at 3 (citing Schoenbaum, *Admiralty & Maritime Law* 5th ed., 2012, Vol. 1, § 3-12).

DOJ responds that the vessels were "without nationality." Dkt. 47 at 5.  "[T]here was no name or markings on the vessel, and the go-fast boat was not flying a flag.  Moreover, a search of the vessel did not reveal any registration documents.  Additionally, when questioned,

none of the crew members indicated that the vessel was registered to a particular country, identified the vessel's owner, or provided paperwork documenting ownership or registration with the Colombian government."  Dkt. 47 at 4–5; *see also* Dkt. 60 at 14, Dkt. 89 at 9–11.

Messrs. Munoz Miranda and Valderrama Carvajal agreed at the motions hearing that they would not present any evidence on the issue of statelessness.  Both from their pleas and the entire record, the Court concludes that DOJ has met its burden of proving statelessness.[8]   In Mr. Munoz Miranda's factual proffer, he conceded that the stolen load was to be shipped aboard a boat that "was not registered in Colombia and did not fly a Colombia flag."  Munoz Miranda SOF ¶ 3.  Mr. Valderrama Carvajal likewise admitted that the vessel that ran aground off Roncador "did not fly a flag, was not registered in Colombia or any other nation, and contained no registration identification" and that "[n]o one in the crew, including the captain, claimed that the go-fast boat was registered in Colombia."  Valderrama Carvajal SOF ¶ 3.  Accordingly, there was no "claim of nationality or registry" as to either vessel at any time.  *See* 46 U.S.C. § 70502(e).  Moreover, because neither boat was registered, had a "claim of nationality or registry" been made, it inevitably would have been rejected.  *See id.* § 70502(d)(1).

These vessels fit comfortably within the concept of a "stateless vessel" or "vessel without nationality" as recognized in international law, as comparison to a representative sampling of cases shows.  *See United States v. Rendon*, 354 F.3d 1320, 1328 (11th Cir. 2003) (vessel stateless when it "flew no flag, contained no identification markings or registration documents, and Colombian officials were unable to confirm [a crewmember's] assertion of Colombian registry") (citations to predecessor statute omitted); *Tinoco*, 304 F.3d at 1115 (vessel

---

[8] As DOJ notes, at the motions hearing, it was ready to call as a witness Ms. Aidee Lopez Fernandez, a former Colombian prosecutor who worked on the case and debriefed some of the crew members; it was also prepared to present testimony regarding the seizure, the distances, and the wiretaps.  Dkt. 89 at 16–17.

stateless where, *inter alia*, there were no "identifying marks on the vessel or any registration documents on board," the crew members "never volunteered the name of the vessel and its registration number," and Colombia, the claimed nation of registration, was unable to confirm or deny the vessel's registry); *United States v. Cuevas-Esquivel*, 905 F.2d 510, 514 (1st Cir. 1990) (vessel stateless when "[n]o one identified himself as the master or person in charge,[ ] the vessel had no name, no flag, or other identifying characteristics" and "the crew denied knowing who the master was, the name of the vessel and its nationality").

The Court turns to the Defendants' legal argument—that a vessel cannot be "stateless" unless it is in international waters. *See* Dkt. 91 at 3. This argument fails for several reasons. First, Messrs. Munoz Miranda and Valderrama Carvajal overstate the contents of the only source on which they rely, an admiralty law treatise. That text states a proposition that is far less helpful than the one the Defendants cite it for: "Since stateless vessels are 'international pariahs' and have no right to navigate freely on the high seas, they may be subjected to the jurisdiction of any state." Schoenbaum, *supra*, § 3-12 at 216. This statement says nothing about tying statelessness to seizure only on the high seas. Second, as discussed below, the Court finds that the go-fast boat seized by the Colombian Navy did travel through the high seas. The Defendants have offered nothing more than speculation that the vessel was equipped with registration documents or a flag while it was on the high seas, before reentering Colombian waters. To the contrary, the description of that vessel in the factual proffer was unequivocal and unconditional: "The go-fast boat did not fly a flag, was not registered in Colombia or any other nation, and contained no registration identification." Valderrama Carvajal SOF ¶ 3. Third, the Court has located no authority—in MDLEA or otherwise—for the proposition that stateless vessels only become truly stateless when they cross into the high seas. The absence of such

authority is unsurprising; the *sine qua non* of statelessness is the vessel's lack of nationality, not where the vessel happens to be. *See Rosero*, 42 F.3d at 171 ("[T]he core of the concept of a vessel that is 'without nationality' or stateless is that the vessel lacks authorization to fly the flag of any recognized state.").

Accordingly, the Court concludes that the vessels used by the DTO were subject to the jurisdiction of the United States as vessels without nationality. *See* 46 U.S.C. §§ 70502(c)(1)(A), (d)(1).

## 2. Travel through the High Seas

Messrs. Munoz Miranda and Valderrama Carvajal contend that there is no evidence that the go-fast vessel actually traveled on the high seas at any point prior to being seized. DOJ responds that the circumstantial evidence overwhelmingly confirms that the vessel passed through the high seas at least once. For the reasons discussed below, the Court concludes that DOJ has shown by a preponderance of the evidence that the vessel did pass through the high seas.

According to Messrs. Munoz Miranda and Valderrama Carvajal, they "at no time conceded . . . that the boat traveled through the high seas, nor from where the boat initially embarked, or its route of travel, [or] which waters it traversed . . . . [T]he government's discovery, namely, statements of crew members, are inconsistent to each other, on various points of their travel including where exactly they departed . . . ." Dkt. 95 at 2–3.[9] The Defendants reason that "[t]he vessel may have traveled along the territorial waters of Panama and other nations before returning to Colombian waters [where] it was seized." Dkt. 51 at 5. Their

---

[9] Although the Defendants' joint stipulations of facts concede that the DTO transported narcotics "on stateless go-fast vessels through international waters," neither stipulation states that the go-fast vessel at issue here traveled through international waters.

argument, then, is that it is possible the go-fast vessel skirted the coasts of Colombia, Panama,

Costa Rica, and Nicaragua, then traveled from island to island, never traveling outside of the

territorial seas of those nations at any point prior to being interdicted.  *See* Map A.

DOJ responds that "it is a reasonable inference from the crew's post-arrest

statements that the vessel left a point somewhere on the northern coast of Colombia, then

traveled through international waters, before being interdicted by the Colombian officials on

Roncador's reefs."  Dkt. 60 at 21.  DOJ summarizes those statements as follows:

> One of the crew members, Domingo Borja Melendez, admitted
> that he was Captain of the go-fast vessel and that the crew picked
> up the cocaine-laden vessel at Puerto Estrella, which is located in
> La Guajira Department on the Northern Coast of Colombia.  He
> further stated that they were instructed to deliver the drugs that
> were on that vessel to another that would be located in Honduran
> waters.  Two other crew members, Elvis Ramos Gorgona and
> Miguel Antonio Benitez Ladeus, stated that they left from a place
> close to Coveñas, which is also on the Northern Coast of
> Colombia.  Benitez Ladeus also stated that they were headed
> towards a key in San Andres when they detoured to Roncador after
> being spotted by a plane.

Dkt. 47 at 6.

Moreover, according to DOJ, "it would have been impossible for the go-fast

vessel to depart the northern coast of Colombia, at the points the crew members described, and

reach Roncador Island, without venturing into waters beyond the 12 nautical mile territorial limit

of Colombia (or Nicaragua, Honduras, or Panama, for that matter)."  Dkt. 89 at 17.  DOJ also

relies on the judicially authorized wiretaps, during which members of the DTO discussed

coordinates in international waters at which the go-fast vessel was to meet another vessel to

transfer the cocaine.  Dkt. 60 at 18; *see also* Dkt. 89 at 12–13.

Both the evidence proffered by DOJ and logic firmly support DOJ's contention

that the go-fast vessel traveled on the high seas.  Nothing in the record supports the Defendants'

theory that the go-fast vessel intentionally scooped a longer, wide U-shaped path along the coasts and islands.  To the contrary, all of the crew members testified that they left the north Colombian coast and headed towards a rendezvous point off Honduras.  *E.g.*, Statement of Carlos Andres Naranjo Jaramillo, Dkt. 60, Ex. B [Dkt. 60-2] at 3 ("We left in the early morning hours of Friday from beyond Coveñas headed toward the cays over here, of San Andres.  We sailed all night until we were intercepted by the plane and they made us run aground."); Statement of Domingo Borja Melendez, Dkt. 60, Ex. B [Dkt. 60-2] at 6–13 (go-fast vessel's captain statement that he was instructed to deliver the cocaine to "a boat in Honduran territorial waters").  Taking a circuitous route would have been contrary to the goal of using the go-fast vessel: to transport narcotics as swiftly as possible while minimizing the risk of interdiction.

Even if the go-fast vessel had taken a circuitous route in an attempt to avoid the high seas, there is a stark fact of geography the Defendants cannot overcome.  According to Map A, the chart prepared by the ICJ, there is no land mass within 12 nautical miles of Roncador. The nearest island in the most logical U-pattern is Providencia Island, 75 nautical miles away; the Serrano Cays are approximately 45 nautical miles away from Roncador.  The go-fast vessel must, therefore, have traveled outside the 12-mile territorial sea limit at some point.  Even assuming travel in a perfectly plotted path, it was impossible for the go-fast vessel to have arrived on Roncador's reefs without having traveled on the high seas.  The Court thus proceeds to the other sections of its analysis having found that the go-fast vessel did travel on the high seas.[10]

---

[10] At the motions hearing, the Court commented that "this go-fast boat was probably on the high seas, I mean, almost certainly as a matter of logic but not unfortunately proof."  Oct. 11, 2012 Hr'g Tr., Dkt. 89, Ex. 1 [Dkt. 89-1] at 116.  That statement was not intended to be a finding of fact.  As discussed in this Opinion, the Court concludes that DOJ has met its burden of showing by a preponderance of the evidence that the vessel traveled on the high seas.

### D.  Statutory Subject Matter Jurisdiction

The Defendants also argue that the offenses with which they are charged fall outside the scope of MDLEA.  Analysis of any statute that purports to apply extraterritorially—that is, to conduct outside the United States—begins with two preliminary inquiries: (1) did Congress intend the statute to apply extraterritorially?; and (2) the *Charming Betsy* canon: should the Court give the statute a limited interpretation to comport with international law?  After addressing those matters, the Court turns to the specific arguments raised by Messrs. Munoz Miranda and Valderrama Carvajal: (1) DOJ has not alleged that they conspired while "on board" a vessel subject to United States jurisdiction; (2) there is no allegation that Defendants' conduct had any nexus to the United States; and (3) prosecution in the United States fails *ab initio* because Colombia has not "consented."

As discussed in more detail below, the Court concludes that, as a matter of statutory construction, MDLEA prohibits the conduct charged here because the Defendants conspired with the crew to distribute a controlled substance on board a stateless vessel.

### 1.  Extraterritorial Application

"It is beyond doubt that, as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'"  *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  "Although there is a presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States, that presumption can be overcome when Congress clearly expresses its intent to do so."  *Yousef*, 327 F.3d at 86 (citing, *inter alia*, *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949)); *see also Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within

the territorial jurisdiction of the United States." (internal quotation marks and citations omitted));

*United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005).  If Congress's intent is clear, and the

statute is not otherwise beyond constitutional authority, then courts are bound to follow that

intent so long as the Fifth Amendment's guarantee of due process is satisfied.  *See Yousef*, 327

F.3d at 86 (citation omitted); *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983).

   The presumption against extraterritoriality does not apply to criminal statutes that

are "not logically dependent on their locality for the government's jurisdiction."  *See United*

*States v. Bowman*, 260 U.S. 94, 98–99 (1922) (giving as examples "enticing desertions from the

naval service" and "[f]orging or altering ship's papers").  In those cases, "to limit [the statute's]

locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of

the statute and leave open a large immunity for frauds as easily committed by citizens on the

high seas and in foreign countries as at home," and Congress can reasonably be assumed to have

intended to criminalize conduct beyond United States borders.  *See id.*; *see also Yakou*, 428 F.3d

at 252 ("[A]bsent an indication from Congress to the contrary, the crime of aiding and abetting

'confer[s] extraterritorial jurisdiction to the same extent as the offense [ ] that underlie[s it].'

(quoting *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); alterations in *Yakou*)).

   No hesitation is required; Congress intended MDLEA to apply extraterritorially.

The conduct alleged in this case, while at the outer limits of the statutory text, nonetheless falls

within it: Congress criminalized "attempting or conspiring" to "knowingly or intentionally

manufacture or distribute, or possess with intent to manufacture or distribute, a controlled

substance on board."  46 U.S.C. §§ 70503(a)(1), 70506(b).  There is no territorial limitation in

the statutory text, and the offenses reached by it overcome the presumption against

extraterritoriality because they "not logically dependent on their locality" for United States

jurisdiction.  *Bowman*, 260 U.S. at 98–99.  Congress's designs are made even more plain by the

supporting sections of MDLEA, in which Congress "declare[d] that trafficking in controlled

substances aboard vessels is a serious international problem" and specified that § 70503(a)

"applies even though the act is committed outside the territorial jurisdiction of the United

States."  46 U.S.C. §§ 70501, 70503(b).  Courts have uniformly ruled that MDLEA applies to

conduct outside the United States.  *E.g.*, *United States v. Davis*, 905 F.2d 245, 248 (9th Cir.

1990) ("Congress explicitly stated that it intended the Maritime Drug Law Enforcement Act to

apply extraterritorially.").

   It bears emphasizing that the Court's conclusion as to extraterritoriality extends to

the conspiracy provision.  As the plain text quoted above makes clear and as courts have

recognized, MDLEA's conspiracy prohibition reaches coextensively with the substantive

offense.  *See Pinto-Mejia*, 720 F.2d at 259 ("[T]here is evidence that Congress had as a primary

goal the ability to reach stateless possessors of narcotics who could not be proved to have intent

to distribute the narcotics in the United States."); *cf. Yousef*, 327 F.3d at 87–88 ("[I]f Congress

intended United States courts to have jurisdiction over the substantive crime of placing bombs on

board the aircraft at issue, it is reasonable to conclude that Congress also intended to vest in

United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit that

crime.").

### 2.  *Charming Betsy*

   Under the *Charming Betsy* canon, the Court is required to consider whether

extraterritorial application of a Congressional statute accords with international law.

   The Supreme Court early cautioned that "an act of congress ought never to be

construed to violate the law of nations, if any other possible construction remains . . . ." *Murray*

*v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 117–18 (1804); *accord Weinberger v. Rossi*, 456

U.S. 25, 32 (1982) (applying *Charming Betsy* as a "maxim of statutory construction").

Nonetheless, the *Charming Betsy* canon guides interpretation of ambiguous statutes as a matter

of international comity, not as a hard-and-fast rule.  "[I]n fashioning the reach of our criminal

law, 'Congress is not bound by international law.  If it chooses to do so, it may legislate with

respect to conduct outside the United States, in excess of the limits posed by international law.'"

*Yousef*, 327 F.3d at 86 (quoting *Pinto-Mejia*, 720 F.2d at 259; other citations omitted).  "If a

statute makes plain Congress's intent (instead of employing ambiguous or 'general' words), then

Article III courts, which can overrule Congressional enactments only when such enactments

conflict with the Constitution, must enforce the intent of Congress irrespective of whether the

statute conforms to customary international law."  *Id.* at 93 (internal citation and quotation

omitted).  "[W]ithin the domestic legal realm, that inconsistent statute simply modifies or

supersedes customary international law to the extent of the inconsistency."  *United States v.

Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) (quoting *Comm. of U.S. Citizens Living in Nicar. v.

Reagan*, 859 F.2d 929 (D.C. Cir. 1988)).

          As discussed above, Congress's intent in passing MDLEA was plain: MDLEA is

intended to apply extraterritorially, and on its face it reaches the conduct alleged in this case:

conspiracy to use a stateless vessel to distribute narcotics.  *See* 46 U.S.C. §§ 70503(a)(1),

70506(b); *see also id.* § 70503(b) (§ 70503(a) applies "even though the act is committed outside

the territorial jurisdiction of the United States").  The Court is thus bound to apply MDLEA as

written regardless of whether application of MDLEA in this case is consistent with international

law.  *See Yunis*, 924 F.2d at 1091.

          Whether MDLEA is, in fact, contrary to international law is a difficult question.

It suffices to say that DOJ has not demonstrated any clear authority under international law for

the proposition that a country may exercise jurisdiction over conspirators whose conduct took place wholly in a foreign country, with no demonstrated nexus to the country exercising jurisdiction, on the theory that the conspiracy involved use of a stateless vessel that traveled on the high seas.   However, the Defendants have likewise not pointed to any clear authority to demonstrate that their prosecution contravenes international law.

"[I]nternational law itself imposes limits on the extraterritorial jurisdiction that a domestic court may exercise.  It generally recognizes five theories of jurisdiction, the objective territorial, national, passive, protective and universal."  *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 n.7 (D.C. Cir. 1984).  This Court summarized the five theories as follows:

> *Territorial*, wherein jurisdiction is based on the place where the offense is committed; *National*, wherein jurisdiction is based on the nationality of the offender; *Protective*, wherein jurisdiction is based on whether the national interest is injured; *Universal*, wherein jurisdiction is conferred in any forum that obtains physical custody of the perpetrator of certain offenses considered particularly heinous and harmful to humanity; and *Passive personal*, wherein jurisdiction is based on the nationality of the victim.

*United States v. Yunis*, 681 F. Supp. 896, 899–900 (D.D.C. 1988), *aff'd*, 924 F.2d 1086 (D.C. Cir. 1991).

DOJ relies in this case on two theories: universal and protective.  *See* Dkt. 60 at 6–7 (citing, *inter alia*, *Romero-Galue*, 757 F.2d at 1154–55).  Congress invoked both theories in the text of MDLEA.  *See* 46 U.S.C. § 70501(1) ("Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States . . . .").  Nonetheless, there are distinct weaknesses when applying either theory to the conduct at issue here.  As to universal jurisdiction, "[n]o source of customary international law

has designated drug trafficking as being subject to universal jurisdiction. The academic

community is in accord that drug trafficking is not considered a universal jurisdiction offense.

. . . [And] several courts of appeals have held that drug trafficking is not a universal jurisdiction

offense . . . ." *Bellaizac-Hurtado*, 700 F.3d at 1260–61 (Barkett, J., concurring).  *United States v.*

*Salcedo-Ibarra*, No. 8:07-CR-49-T-27TGW, 2009 WL 1953399, at *1 (M.D. Fla. July 6, 2009),

cited by DOJ in support of its claim for universal jurisdiction, was implicitly overruled by

*Bellaizac-Hurtado* and did not provide a rationale that would clearly survive *Bellaizac-Hurtado*.

*Salcedo-Ibarra* stated only: "Just as trafficking in narcotics on the high seas is considered an

offense against the 'Law of Nations,' including the United States, likewise, conspiring to traffic

in narcotics on the high seas constitutes such an offense." *Id.*  On the other hand, *Bellaizac-*

*Hurtado* is not binding on this Court.

   Protective jurisdiction makes a better, if not perfect, fit.  "The protective principle

permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory

threatens the nation's security or could potentially interfere with the operation of its

governmental functions." *Romero–Galue*, 757 F.2d at 1154.  "The protective principle does not

require that there be proof of an actual or intended effect inside the United States. The conduct

may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by

nations that have reasonably developed legal systems." *United States v. Gonzalez*, 776 F.2d 931,

939 (11th Cir. 1985).  It is beyond peradventure that illegal drugs are a problem in the United

States, and, specifically, that cocaine imported to the United States from Colombia is a major

part of that problem.  *See, e.g.*, *United States v. Cabrera*, 734 F. Supp. 2d 66, 72 (D.D.C. 2010)

(finding as fact from trial testimony that "[t]he United States is the world's largest cocaine

consumer and approximately 90% of the cocaine consumed in the United States comes from

32

Colombia").  The protective principle may justify the United States's criminalization of the

conduct charged here; these Defendants are part of the lengthy supply chain by which cocaine

enters the United States.  But the Court has located no real authority for applying the protective

principle to drug trafficking beyond *Romero-Galue*, in which the defendants were seized aboard

the smuggling vessel by the United States Coast Guard.  757 F.2d at 1149.  The Eleventh Circuit

in that case stated: "Even absent a treaty or arrangement, the United States could, under the

'protective principle' of international law, prosecute foreign nationals on foreign vessels on the

high seas for possession of narcotics."  *Id.* at 1154.  *Romero-Galue* offers no guidance as to

conspiracy in a foreign country, stateless vessels, seizure by foreign authorities, or the absence of

a direct nexus to the United States.

Because the D.C. Circuit has not addressed whether MDLEA comports with

international law under these facts and it is ultimately not necessary to do so, the Court declines

to answer that question here.  Whether this prosecution is consistent with the protective principle

is ultimately not dispositive because there is no ambiguity in MDLEA, and the Court must

enforce the statute as written by Congress unless there are other constitutional infirmities.  *See*

*Yousef*, 327 F.3d at 93.[11]

---

[11] The application of international law to this prosecution, involving conspirators who used
stateless vessels, is separate from whether international law would permit the United States to
exercise jurisdiction over a stateless vessel and, thus, its inhabitants.  A separate set of rules
governs those facts.  "[I]nternational law generally prohibits any country from asserting
jurisdiction over foreign vessels on the high seas" because "such vessels are normally considered
within the exclusive jurisdiction of the country whose flag they fly."  *United States v. Marino-
Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982) (citing, *inter alia*, *The S.S. Lotus*, (1927) P.C.I.J.
ser. A, No. 10 at 25).  It is clear that, as far as the high seas are concerned, "the objective,
protective, and territorial principles 'have no applicability' . . . because such vessels are
'international pariahs' that have 'no internationally recognized right to navigate freely on the
high seas.'"  *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1379 (11th Cir. 2011) (quoting
*Marino-Garcia*, 679 F.2d at 1382).  Thus, "international law places no restrictions upon a
nation's right to subject stateless vessels to its jurisdiction."  *Marino-Garcia*, 679 F.2d at 1382.

### 3.  Whether MDLEA Requires Conspiring "On Board" a Vessel

Defendants advance a novel statutory interpretation: MDLEA may criminalize conspiracy, but the law only applies when the conspirators conspire while "on board" a vessel subject to United States jurisdiction.  The Court rejected this clever but cabined reading of the statute at the October 12, 2012, hearing, and does so again now.

Messrs. Valderrama Carvajal and Munoz Miranda contend that "the indictment fails to charge conduct 'on board a vessel of the United States or subject to the jurisdiction of the United States.'"  Dkt. 53 at 2.  Relying on the plain language of the statute, prior prosecutions, and the legislative history, they argue that DOJ's "failure to specifically allege that any co-conspirator(s) were actually *on board a vessel*[ ] renders the indictment overbroad, vague, and insufficient to state a crime."  Dkt. 65 at 1–9.  According to the Defendants, "[t]he penalty provision [46 U.S.C. § 70506], consistent with the rest of the statute, simply says that those who abet or conspire to distribute or possess with the intent to distribute controlled substances on board a vessel, can be punished as principals.  It has been read in practically every case[ ] to apply to crew."  Dkt. 85 at 2; *see also* Dkt. 65 at 3 (observing that "[w]ith very rare exceptions," past cases have been brought "against persons on board vessels seized and investigated by U.S. law enforcement").  Moreover, "the legislative history of 46 U.S.C. [app.] § 1903 (and therefore Section 70503), indicates that it applies to conduct of persons on board vessels."  Dkt. 65 at 6; *see also* Dkt. 85 at 3 (noting that 46 U.S.C. § 70501 states that "trafficking in controlled substances *aboard vessels* is a serious international problem" (emphasis added by Defendants)).

Unsurprisingly, DOJ disagrees.  "That Congress intended to apply the conspiracy provision of the MDLEA to a person who is not on the vessel, but otherwise conspires with those

---

Whether that axiom of international law extends to stateless vessels in a foreign nation's territorial waters is a question that neither courts nor commentators have resolved.

found on board a vessel deemed subject to the jurisdiction of the United States, or with others

intending to use vessels deemed subject to the United States, is clear in the statute's plain

meaning and in the fundamental understanding of what constitutes a conspiracy." Dkt. 88 at 6.

DOJ argues:

> Were it intended, as the defendants claim, that the only individuals
> prosecutable under the MDLEA are those on board the vessel,
> there would have been no need for Congress to have enacted
> § 70506 because § 70503 sufficiently covers crew conduct. Thus,
> defendants' reasoning virtually reads § 70506 out of the statute. In
> addition, a defense interpretation that defendants could only be
> charged with conspiracy once they were on the boat together
> would . . . be an absurd limitation and application of the statute.

Dkt. 60 at 31; *see also* Dkt. 88 at 7 (proposing a scenario in which "an organizational associate

stands on the dock alongside a cocaine-laden go-fast vessel and coordinates the transport with

the captain who is in the boat" and arguing that "under the Defendants' interpretation of the

MDLEA, the dock-side associate could *not* be charged with an MDLEA conspiracy unless or

until he steps onto the boat, whereas the captain could"). According to DOJ, "[w]hen combined

with what defines a conspiracy, it is clear that what § 70506(b) prohibits is any person from

conspiring, agreeing, or coming to a mutual understanding with one or more persons to fulfill the

object of the conspiracy, in this case, to distribute drugs through the use of a vessel, as long as

the vessel is deemed subject to the jurisdiction of the United States under § 70502(c)(1)." Dkt.

88 at 7.

A conspiracy under 46 U.S.C. § 70506(b) to engage in the conduct prohibited by

46 U.S.C. § 70503(a)(1)—that is, a conspiracy to use a vessel subject to the jurisdiction of the

United States to distribute narcotics—must naturally include activities other than those that occur

directly on board the vessel. The statute cannot be read any other way. The qualification

Defendants ask the Court to impose simply has no support in the text of MDLEA, which the

Court finds to be unambiguous. *See* 46 U.S.C. § 70506(b) ("A person attempting or conspiring to violate section 70503 of this title is subject to the same penalties as provided for violating section 70503.").

The Court is aware of at least two other cases in which conspirators not on board a vessel were convicted of violating MDLEA. One court directly rejected the argument advanced by Defendants here. *Salcedo-Ibarra*, 2009 WL 1953399, at *1 ("Just as one who possesses cocaine with the intent to distribute while 'on board' a vessel subject to the jurisdiction of the United States violates the MDLEA, one who conspires with those 'on board' the vessel likewise violates the MDLEA."), *implicitly overruled on other grounds by Bellaizac-Hurtado*, 700 F.3d 1245. Another court primarily addressed due process, but that court's conclusion relied on the premise that MDLEA applies to conspirators not on board the vessel. *See United States v. Medjuck*, 937 F. Supp. 1368, 1369–70, 1375 (N.D. Cal. 1996). In *Medjuck*, the charged MDLEA conspiracy involved members of many nationalities based in a number of countries. The two defendants whose due process interests were discussed in the opinion were not seized on board the vessel; one of them was "an American living in Singapore [who] was responsible for shore-based communications with the transport vessel," and the other was "a Canadian[ ] who . . . purchased the hashish" and was "responsible for bringing it to shore and transporting it inland when it reached North America." 937 F. Supp. at 1382. *Medjuck* thus supports the Court's ruling here.

The Defendants' reading of the statute is also contrary to Congress's intent to expand drug interdiction efforts through MDLEA. As DOJ argues, "[f]or Congress, it was the traffickers' *use of* vessels to transport drugs—i.e., the maritime *modus operandi*—that was the scourge Congress intended to fight. Thus, any individual's efforts to traffic drugs via . . . a

36

vessel subject to the jurisdiction of the United States . . . brings them under the purview of the

MDLEA's conspiracy provision."  Dkt. 88 at 8.   Other courts have recognized the breadth of the

MDLEA.  *See Ledesma-Cuesta*, 347 F.3d at 531 (observing that the MDLEA was passed "to

strengthen the United States' drug laws . . . specifically by removing geographical barriers [that]

had impeded efforts to combat the drug trade").  Furthermore, although Defendants' argument as

to MDLEA is novel, it is a loophole that defendants have unsuccessfully attempted to exploit

regarding similar statutes for almost 200 years.  *See United States v. Holmes*, 18 U.S. (5 Wheat.)

412, 417 (1820) (interpreting a statute punishing "offences committed on the high seas" and

rejecting proposed limited reading because "no reason is perceived why a more restricted

meaning should be given to the expressions of the law, than they literally import.").

The Court concludes that the conduct alleged in this case falls within the scope of

MDLEA's statutory jurisdiction notwithstanding that the Defendants did not conspire while

physically aboard a vessel.

### 4.  Whether MDLEA Requires a Nexus to the United States

Messrs. Valderrama Carvajal and Munoz Miranda contend that their prosecution

is invalid because there is no allegation that their conduct had any nexus to the United States.

*See* Dkt. 53 at 3 ("By failing to allege a presence or even a nexus with a vessel under United

States jurisdiction, the indictment fails to state a crime and must be dismissed.").  Noting the

absence of any nexus requirement in MDLEA, DOJ argues that courts have repeatedly rejected

similar arguments.  *E.g.*, Dkt. 60 at 35.

There is no nexus requirement in MDLEA's text and courts have never imposed

one as a matter of statutory jurisdiction.[12]   Contrary to Defendants' contention, "on its face, the

---

[12] Nexus to the United States can sometimes be relevant in the context of due process.  That
matter is addressed separately below.

statute does not require that there be a nexus between stateless vessels and the United States but instead extends this country's jurisdiction to all such vessels." *United States v. Marino-Garcia*, 679 F.2d 1373, 1379 (11th Cir. 1982); *see also United States v. Caicedo*, 47 F.3d 370, 371 (9th Cir. 1995) ("On its face," MDLEA "extends the United States' jurisdiction over stateless vessels on the high seas without enumerating any further requirements, and particularly without requiring that there be a nexus between a defendant's conduct aboard a stateless vessel and the United States." (citations omitted)).  Indeed, all the courts to consider whether nexus is a statutory concern have answered the question in the negative.[13]  *See United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1055 (3d Cir. 1993) ("Clearly the 26-foot boat was a 'vessel without nationality' because Colombia disclaimed its registry in the second [Statement of No Objection]. Accordingly, there is no doubt that the district court had jurisdiction even if there was not a nexus between Martinez's activities and the United States."); *Medjuck*, 937 F. Supp. at 1380 (surveying legislative history and holding that "Congress did not intend to require United States destination").

          The Court thus concludes that MDLEA does not require a nexus to the United States as a statutory matter.

### 5.  Whether Colombia's Consent Was Required

          The final argument concerning statutory subject matter jurisdiction raised by Defendants is that their prosecution is invalid because the stateless vessel seized off Roncador was apprehended in Colombian territorial waters by Colombians and Colombia did not "consent"

---

[13] A small number of cases contain statements to the contrary.  *See, e.g.*, *Ledesma-Cuesta*, 347 F.3d at 532 ("The case before us, then, is the exact type of case the MDLEA was designed to address: one in which the defendant is caught on the high seas, with drugs intended for illegal distribution once he reaches U.S. territory.").  Because other courts directly addressing the point have not found that MDLEA incorporates a nexus requirement, the Court disregards such passing observations as dicta.

to jurisdiction as required by 46 U.S.C. § 70502(c)(1)(E).  They make this argument in the face

of official paperwork showing that Colombia extradited them both to the United States to face

these specific charges.  The Court rejects this argument and finds that Colombia has consented to

this prosecution.

   The Defendants' argument is that, because MDLEA provides a vessel subject to

United States jurisdiction includes "a vessel in the territorial waters of a foreign nation if the

nation consents to the enforcement of United States law by the United States," 46 U.S.C.

§ 70502(c)(1)(E), Congress intended that the United States could only exercise jurisdiction over

stateless vessels when they are found on the high seas.  Dkt. 61 at 6–7.  Because "[c]onsent is

required for any vessel found within the territories of a foreign nation, . . . 'vessel without

nationality' [as used in 46 U.S.C. § 70502(c)(1)(A)] is qualified."  Dkt. 61 at 7 n.6.  Put another

way, Defendants' theory is that 46 U.S.C. § 70502(c)(1)(E)'s reference to the United States'

jurisdiction over "a vessel in the territorial waters of a foreign nation if the nation consents to the

enforcement of United States law by the United States" trumps the reference to jurisdiction over

a "vessel without nationality" in 46 U.S.C. § 70502(c)(1)(A), so that a stateless vessel in another

nation's territorial waters is not subject to United States jurisdiction unless the other nation

consents.  Dkt. 95 at 4.

   In support of this interpretation, Messrs. Valderrama Carvajal and Munoz

Miranda make reference to 46 U.S.C. § 70508, which provides: "An individual may not operate

by any means or embark in any submersible vessel or semi-submersible vessel that is without

nationality and that is navigating or has navigated into, through, or from waters beyond the outer

limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with

an adjacent country, with the intent to evade detection."  According to Defendants, the

submersible vessel section is drafted so that the United States can exercise jurisdiction as long as "at any time, during the route of travel, the vessel had traversed through the high seas, regardless of where it was ultimately stopped."  This is evidence that "Congress clearly recognized that in some circumstances the route of travel was to be considered and not just where the vessel was seized."  Dkt. 95 at 6–7.

DOJ makes several points in response, but the core of its argument is that "vessel without nationality" in 46 U.S.C. § 70502(c)(1)(A) and "vessel in the territorial waters of a foreign nation if the nation consents" in 46 U.S.C. § 70502(c)(1)(E) are alternative and equally valid grants of jurisdiction to the United States; each stands on its own.  DOJ argues:

> MDLEA's express exercise of jurisdiction over vessels found in another country's territorial waters is not confined to vessels for which a nation consents to the enforcement of U.S. law.  That is, under the MDLEA statute, a "vessel subject to the jurisdiction of the United States" includes *both* "a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States" *and* "a vessel without nationality."

Dkt. 60 at 9 (citing 46 U.S.C. §§ 70502(c)(1)(A), (E)).  Thus, "MDLEA's provision of U.S. jurisdiction over 'a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States,' *see* § 70502(c)(1)(E), is a *separate* basis of jurisdiction, not dependent upon or placing any restriction upon the assertion of jurisdiction over a 'vessel without nationality.'"  Dkt. 60 at 10 (citing *Matos-Luchi*, 627 F.3d at 4).

Under DOJ's reading, because the two grants of jurisdiction are independent, "the 'stateless' nature of a vessel alone is intended to be all that is required to enable the exercise of U.S. jurisdiction under § 70502(d)."  Dkt. 60 at 11.  "[N]othing in the plain text of § 70502(d), defining a 'vessel without nationality,' links the jurisdictional status to a vessel's presence on the high seas or, alternatively, expressly disqualifies a vessel found in the territorial waters of a

foreign nation.  Instead, a vessel is deemed to be 'stateless' because of its *own* lack of assertion

of nationality, *see* §§ 70502(d)(1)(A), (B), and (C), not because of where it is located at any

particular moment, including at the time of interdiction, either within or outside the territorial

waters of another country."  Dkt. 60 at 10 (quoting *Marino-Garcia*, 679 F.2d at 1383, for the

proposition that "Jurisdiction exists solely as a consequence of the vessel's status as stateless.").

 Messrs. Valderrama Carvajal and Munoz Miranda's argument construing 46

U.S.C. § 70502(c)(1) is one no court has yet confronted directly, most likely due to the fact that

litigated MDLEA prosecutions of stateless vessels have arisen almost exclusively from seizures

on the high seas, not in territorial waters.[14]  Despite its novelty, however, this question is not

difficult to resolve.  The statute is clear: there is no territorial qualification on the United States's

jurisdiction over a "vessel without nationality," and the grants of jurisdiction in 46 U.S.C.

§ 70502(c)(1) are equal, discrete alternatives, with each being sufficient on its own to give the

United States authority to exercise its jurisdiction over such vessels.  § 70502(c)(1) states that

"the term 'vessel subject to the jurisdiction of the United States' includes . . ." before listing six

different situations. Reading the statute in the cramped way advocated by the Defendants would

be contrary to the expansive and non-exhaustive character inherent in the use of the word

"includes," *see Hassan v. Mercy American River Hospital*, 74 P.3d 726, 730 (Cal. 2003) ("[T]he

word 'including' in a statute is ordinarily a term of enlargement rather than limitation." (internal

quotation marks and citation omitted)), and it would undercut the broad prosecutorial authority

that Congress authorized in MDLEA.  In addition, the status of "without nationality" depends on

the characteristics of the vessel, not where that vessel is located at any given moment.  Vessels

---

[14] As discussed in the constitutionality analysis below, the Court has located two cases that
appear to have involved stateless vessels seized in territorial waters.  Neither reached this
question.

are stateless because they "lack[ ] authorization to fly the flag of any recognized state." *Rosero*,

42 F.3d at 171.  Messrs. Munoz Miranda and Valderrama Carvajal have not pointed to any

authority for the proposition that a stateless vessel changes its character when it enters a given

country's territorial waters.  Indeed, such a result would perpetuate the jurisdictional loopholes

MDLEA was intended to prevent.  A "vessel without nationality" on the high seas fleeing United

States law enforcement could arguably thwart interdiction efforts by slipping into a foreign

nation's territorial waters, forcing the United States to pause to seek that country's consent.   If a

foreign nation took such a position, it would raise an issue of foreign policy for the Executive,

not a question of jurisdiction here.

        The Court concludes that the language of 46 U.S.C. § 70502(c)(1) "has a plain

and unambiguous meaning."  *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C.

Cir. 2008) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  A vessel is subject to

United States jurisdiction if it is stateless, whether it is located within or without a foreign

nation's territorial waters, and consent of a foreign nation is not required as a precondition of

*court* jurisdiction.

        In the alternative, the Court finds that DOJ has met its burden of showing that

Colombia has consented to enforcement of United States law in this case.  Assuming that 46

U.S.C. § 70502(c)(1)(E) applies, the go-fast vessel seized off Roncador, in Colombia's territorial

waters, became a "vessel subject to the jurisdiction of the United States" through Colombia's

consent when Colombia extradited Messrs. Munoz Miranda and Valderrama Carvajal to the

United States to face these specific charges.  *See* Extradition Orders.  MDLEA provides that

"[c]onsent or waiver of objection by a foreign nation to the enforcement of United States law by

the United States . . . may be obtained by radio, telephone, or similar oral or electronic means;

and is proved conclusively by certification of the Secretary of State or the Secretary's designee."
46 U.S.C. § 70502(c)(2).  While the first part of this provision is likely most applicable in
exigent circumstances, such as where the United States Coast Guard has pursued a foreign-
flagged vessel believed to be trafficking narcotics and needs consent immediately, there is no
reason why Defendants' extradition is insufficient.  Under the international law "rule of
specialty," the United States as the requesting party is bound to try the Defendants only for those
offenses as to which Colombia agreed to extradite.  *See Berenguer v. Vance*, 473 F. Supp. 1195,
1197 (D.D.C. 1979) (describing the rule as having "long been recognized" in the United States
and citing, *inter alia*, *United States v. Rauscher*, 119 U.S. 407, 415–30 (1886)).  Defendants have
made no challenge to the validity of their extraditions, and the record demonstrates that
Colombia was fully apprised of the charges and circumstances before it agreed to extradite.

### 6.  Conclusion

For the reasons discussed above, the Court rejects each of the challenges that the
Defendants make to statutory subject matter jurisdiction.  Conspiracy to use a stateless vessel to
distribute cocaine is conduct prohibited by the statute, even when the Defendants charged were
not aboard the vessel at the time of seizure and even when the seizure took place in a foreign
nation's waters.  That, however, is not the end of the matter.

### E.  Constitutionality of MDLEA as Applied

This case stands at the far reaches of Congress's constitutional power to
criminalize extraterritorial conduct.  While a number of courts have upheld MDLEA against
constitutional challenges, very few have addressed stateless vessels seized in foreign territorial
waters, very few have addressed the liability of conspirators who never set foot on a "vessel
subject to the jurisdiction of the United States," and none, to this Court's knowledge, has
considered whether the combination of those facts would exceed the constitutional reach of the

43

United States.  Resolving this question is complicated because there are four provisions in the

Constitution that arguably give Congress the power to enact and enforce MDLEA, but courts

often combine analysis of those grants of authority in a given case.  For the reasons set forth

below, this Court ultimately concludes that Congress had the power to criminalize the conduct

charged here under its power to "define and punish . . . Felonies committed on the high Seas."

U.S. Const. Art. I § 8, cl. 10.

   Two separate clauses, comprising a total of four grants of authority, may grant

Congress the power to criminalize the conduct alleged in this case: (1) Article I § 8, clause 10,

and (2) the power to implement and enforce treaties.  Article I § 8, clause 10 provides: "The

Congress shall have Power . . . To define and punish Piracies and Felonies committed on the

high Seas, and Offences against the Law of Nations . . . ."  This provision contains three separate

grants of power.  *See United States v. Shi*, 525 F.3d 709, 721 (9th Cir. 2008) (citing *United States

v. Smith*, 18 U.S. (5 Wheat.) 153, 158–61 (1820)).  Courts have not consistently analyzed the

three phrases separately and have not been uniform in the common names used to refer either to

the entire clause or to the three phrases therein.  This Court will refer to the entire clause as

Clause 10 and to the three powers as, respectively, the Piracies Clause, the Felonies on the High

Seas Clause, and the Law of Nations Clause.   Because Congress has the authority to criminalize

the conduct charged here through the Felonies on the High Seas Clause, the Court addresses in

depth only that power.  However, because the parties' arguments have implicated all four

provisions, the Court briefly discusses the Treaty Power, the Piracies Clause, and the Law of

Nations Clause before discussing the Felonies on the High Seas Clause.

### 1.  Legal Standard—Constitutionality

   Because "'[t]he powers of the legislature are defined and limited,'" "[e]very law

enacted by Congress must be based on one or more of its powers enumerated in the

Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803)).  Statutes are presumed to be constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."  *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 412 U.S. 356, 364 (1973)).  "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Nat'l Fed'n Indep. Bus. v. Sebelius* (*The Healthcare Cases*), 132 S. Ct. 2566, 2594 (2012) (internal citation and quotation marks omitted).

Congress's powers are not limited to the mere text of each constitutional grant of authority; it also has the authority to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. Art. I § 8, cl. 18.  "[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'"  *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)).  "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *Id.* at 1956–57 (citing *Sabri v. United States*, 541 U.S. 600, 605 (2004)).

## 2.  The Treaty Power

The United States has argued in its petition for rehearing *en banc* in *Bellaizac-Hurtado* in the Eleventh Circuit that Congress had the power to criminalize MDLEA offenses charged in that case under the Treaty Power.  In this Court, DOJ acknowledges that the

government's position in *Bellaizac-Hurtado* is novel; it was not argued before the district court or the original Eleventh Circuit panel, and it is not a theory that, to this Court's knowledge, any court has considered as a possible grant of authority for a MDLEA prosecution.  Since Defendants rely so heavily on *Bellaizac-Hurtado*, this Court directed the parties to brief whether the Treaty Power authorizes Congress to criminalize the conduct charged in this case.

"Congress's authority under the Necessary and Proper Clause extends beyond those powers specifically enumerated in Article I, section 8" when it "enact[s] laws necessary to effectuate the treaty power, enumerated in Article II of the Constitution."  *United States v. Lue*, 134 F.3d 79, 82 (2d Cir. 1998) (citing, *inter alia*, *Missouri v. Holland*, 252 U.S. 416, 432 (1920)).  The United States has ratified the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 19, 1988, 1582 U.N.T.S. 95 ("1988 Convention") and has "negotiated approximately 41 bilateral agreements, all geared towards enhancing the effectiveness of the suppression of illicit drug trafficking by sea through the bilateral cooperation encouraged by the 1988 Convention."  Dkt. 97 at 6.  The United States has entered into such an agreement with Colombia (and Panama).  *See id.* (citing Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic By Sea, U.S.-Colom., Feb. 20, 1997, T.I.A.S. No. 12835). Therefore, the Treaty Power may be a grant of power on which the United States can rely in some MDLEA prosecutions.

DOJ has notified the Court, in its response to the Court's Minute Order directing the parties to address the Treaty Power, that it does not rely on the Treaty Power to assert MDLEA jurisdiction over Messrs. Munoz Miranda and Valderrama Carvajal.  *See* Dkt. 97 at 3–8.  DOJ explains: (1) "because the vessel traveled the high seas[,] . . . extending United States

jurisdiction . . . is clearly constitutional under the Felonies on the High Seas Clause of Article I,

§ 8, cl. 10," and (2) "the U.S.-Colombia Agreement governs the boarding and search of

*Colombian-flagged* vessels by law enforcement officials of the United States, and does not

address either country's jurisdiction over a stateless vessel, such as the one at issue in this case."

*Id.* at 3, 7 (citing U.S.-Colombia Agmt. ¶ 6).  Thus, according to DOJ, *Bellaizac-Hurtado* is

inapposite because there is no allegation that its vessel traversed the high seas and because "the

Government relied on consent from Panama to establish jurisdiction under § 70502(c)(1)(E)."

*Id.* at 3–4.  Because "the [U.S.-Colombia] Agreement does not limit the United States' ability to

pursue MDLEA jurisdiction over a stateless vessel which travels on the high seas," DOJ does not

need to, and does not, rely on the Treaty Power in this case.  *Id.* at 8.  Because the United States

does not rely on the Treaty Power in this case, the Court will not analyze that issue further, and

turns next to Clause 10.[15]

### 3.  Article I, Section 8, Clause 10: The Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations . . . .

In addressing whether the exercise of Congress's authority is proper under Clause

10, the Court begins by reviewing a handful of sources that are on point but not dispositive for

two different reasons.  Some courts uphold MDLEA without specifying which grant of power in

Clause 10 is the subject of analysis, while other courts do not delineate their discussions of

---

[15] Although DOJ does not address the point in any of its filings, the 1988 Convention authorizes countries to criminalize "participation in, association or conspiracy to commit, attempts to commit and aiding, abetting, facilitating and counselling the commission" of "distribution . . . of any narcotic drug or any psychotropic substance . . . ."  Art. 3.1(a)(i), (c)(iv).  That is the substantive offense charged here.  But DOJ's assertion of jurisdiction goes beyond the scope authorized by the 1988 Convention, which has a nexus requirement: it permits a country to assert jurisdiction when such an offense is "committed outside its territory with a view to the commission, within its territory, of an offence [under Art. 3.1(c)(iv)]."  Art. 4.1(b)(iii).  DOJ has conceded that it cannot show any direct connection to the United States.

Congress's authority to criminalize conduct from their discussions of due process concerns.  The

Court then addresses each of the three grants contained in Clause 10, addressing the specific

facts of this case.

### i. Cases Upholding MDLEA as Generally Constitutional

Perhaps the most-cited case upholding MDLEA as constitutional is *United States*

*v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993).  The *Martinez-Hidalgo* court wrote:

> [W]e point out that the framers of the Constitution themselves
> provided that Congress had the power '[t]o define and punish
> Piracies and Felonies committed on the high seas, and Offenses
> against the Law of Nations.' U.S. Const. Art. I § 8, cl. 10.
> Inasmuch as the trafficking of narcotics is condemned universally
> by law-abiding nations, we see no reason to conclude that it is
> 'fundamentally unfair' for Congress to provide for the punishment
> of persons apprehended with narcotics on the high seas.

*Id.*  However, this passage from *Martinez-Hidalgo* is from that court's discussion of whether

prosecution under MDLEA comported with the Fifth Amendment's due process guarantee—the

"fundamentally unfair" test is one of several employed in a due process analysis.  The distinction

is not often made, as courts cite *Martinez-Hidalgo* for the broader proposition that "Congress had

authority to enact [MDLEA], pursuant to its constitutional power to 'define and punish Piracies

and Felonies committed on the high seas, and Offenses against the Law of Nations.'"  *See, e.g.*,

*Ledesma-Cuesta*, 347 F.3d at 531–32.

The Eleventh Circuit has had occasion to issue a different line of cases upholding

MDLEA as a general matter.  In a *per curiam* opinion that analyzed constitutionality and due

process together, the Eleventh Circuit held that "the district court did not err by failing to hold

sua sponte that Congress exceeded its authority under the Piracies and Felonies Clause in

enacting the MDLEA."  *United States v. Estupinan*, 453 F.3d 1336, 1338 (11th Cir. 2006) (citing

*Rendon*, 354 F.3d at 1325 n.2; *United States v. Moreno-Morillo*, 334 F.3d 819, 824–25 (9th Cir.

2003); and *Ledesma-Cuesta*, 347 F.3d at 531–32).  In a non-precedential opinion issued later in

2006, the Eleventh Circuit held: "While we have not addressed the precise question raised here

and while there is little case law interpreting the scope of the High Seas Clause, other circuits

have upheld the constitutionality of the MDLEA . . . ."  *United States v. Garcia*, 182 F. App'x

873, 876 (11th Cir. 2006) (*per curiam*) (citing *Moreno-Morillo*, 334 F.3d at 824 & *Martinez-*

*Hidalgo*, 993 F.2d at 1056). The *Garcia* court stated that it was upholding the MDLEA in that

case "[b]ecause the High Seas Clause granted Congress the power to define and punish offenses

committed on the high seas."  182 F. App'x at 877 (also stating that the MDLEA could be

enacted pursuant to the protective principle of international law).  In a case involving a different

statute in 2011, the Eleventh Circuit affirmed the continuing validity of *Estupinan*, observing

that *Estupinan* stood for the proposition that Congress did not exceed "its constitutional authority

under the High Seas Clause in passing a statute [the MDLEA] that punishes conduct without a

nexus to the United States."  *United States v. Saac*, 632 F.3d 1203, 1210 (11th Cir. 2011); *see*

*also id.* ("[B]ecause the MDLEA criminalizes conduct that is condemned universally, the

statute's extraterritorial reach [is] permissible.").

   In one of the only decisions to address conspirators who were not alleged to have

been aboard the vessel, a district court applied Eleventh Circuit precedent to conclude that "[j]ust

as the extraterritorial reach of the MDLEA is constitutional as to those on board the vessel, its

reach is likewise constitutional as to an individual like Defendant, who allegedly conspired with

those on board the vessel."  *United States v. Salcedo-Ibarra*, No. 8:07-CR-49-T-27TGW, 2009

WL 1953399, at *1 (M.D. Fla. July 6, 2009).  The *Salcedo-Ibarra* court reasoned:

> The MDLEA is a constitutional exercise of extraterritorial
> jurisdiction pursuant to the Define and Punish Clause, under the
> "protective principle" of international law. *Tinoco*, 304 F.3d at
> 1110.  Likewise, as applied to foreign nationals such as Defendant,

the MDLEA is constitutional. *United States v. Estrada-Obregon*, 270 F. App'x 978, 979 (11th Cir. 2008). International drug trafficking, as proscribed by the MDLEA, is universally condemned as an offense against the "Law of Nations" and presents a specific threat to the security and societal well-being of the United States. *United States v. Estupinan–Estupinan*, 244 F. App'x 308 (11th Cir. 2007). Just as trafficking in narcotics on the high seas is considered an offense against the "Law of Nations," including the United States, likewise, conspiring to traffic in narcotics on the high seas constitutes such an offense.

. . .

Here, extraterritorial application of the conspiracy provisions of the MDLEA to Defendant, who was not found on board a vessel subject to the jurisdiction of the United States, but allegedly conspired with those on board, is justified on the objective territorial principle. . . . As discussed, the substantive act proscribed by the MDLEA, the possession of narcotics while on board a vessel subject to the jurisdiction of the United States, has a sufficiently deleterious effect within the United States to justify this country in prohibiting that conduct.

*Id.* at *1–4.

While *Salcedo-Ibarra*'s reasoning arguably applies in this case—at least to the extent that Messrs. Munoz Miranda and Valderrama Carvajal were not on board the vessel, leaving aside its seizure in territorial waters—the continuing validity of that court's holding is questionable after the Eleventh Circuit's opinion in *Bellaizac-Hurtado*, the case upon which Defendants rely, which concluded that MDLEA is not constitutional under the Law of Nations clause.

One final general source on the applicability of Clause 10 is a law review article relied on heavily by Messrs. Munoz Miranda and Valderrama Carvajal. Professor Eugene Kontorovich of the Northwestern University School of Law argues that all three parts of Clause 10 are limited to "crimes that international law has established as universally cognizable" and the MDLEA is unconstitutional because there is "no support in international custom for treating

[drug smuggling] as a [universal jurisdiction] crime." Eugene Kontorovich, "Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes," 93 Minn. L. Rev. 1191, 1194–96 (April 2009). Professor Kontorovich's analysis was cited and adopted wholesale by Judge Torruella of the First Circuit in a dissenting opinion in an MDLEA case, *United States v. Cardales-Luna*, 632 F.3d 731 (1st Cir. 2011). Judge Torruella argued that the MDLEA's application to "a Colombian national . . . apprehended in international waters . . . aboard a Bolivian-registered vessel . . . en route from Colombia to the Dominican Republic" was an "*ultra vires* extension of [Congress's] Article I legislative powers to foreign territory, as applied to persons and/or activities that have no nexus with the United States." *Cardales-Luna*, 632 F.3d at 739. The majority in *Cardales-Luna* held that the defendant's constitutional challenge had not been preserved in the district court or on appeal and declined to reach the issue. *Id.* at 737–38.

　　　　While Professor Kontorovich's scholarly analysis reflects extensive research, it ultimately simply reflects an "opinion of what the law ought to be, not what it is," *M'ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280, 306 (1805), and the Court declines to adopt his analysis here. The Court addresses each of the three phrases in Clause 10 separately to determine which phrase, if any, supports the exercise of court jurisdiction in this case. Because DOJ does not rely on the Piracy Clause or the Law of Nations Clause in this case, the Court only briefly addresses those two clauses before turning to the Felonies on the High Seas Clause.

### ii. Piracy

　　　　The best argument for applying the Piracy Clause to this case is that the stateless vessels the DTO used to transport narcotics could be considered pirates under international law

due to their nationless status.  For example, in *United States v. Holmes*, 18 U.S. (5 Wheat.) 412,

417 (1820), the Supreme Court held:

> [I]f the offence be committed in a vessel, not at the time belonging
> to subjects of a foreign State, but in possession of persons
> acknowledging obedience to no government or flag, and acting in
> defiance of all law, it is embraced by the act of the 30th of April,
> 1790. It follows, therefore, that murder or robbery committed on
> the high seas, may be an offence cognizable by the Courts of the
> United States, although it was committed on board of a vessel not
> belonging to citizens of the United States, as if she had no national
> character, but was possessed and held by pirates, or *persons not
> lawfully sailing under the flag of any foreign nation*.

(Emphasis added).  *See also United States v. Klintock*, 18 U.S. (5 Wheat.) 144, 152 (1820).

However, the problems with this argument are numerous and complex.  The first

obstacle is that the cases supporting the broadest reading of the Piracy Clause, one under which

Congress has the power to criminalize effectively any offense committed aboard a stateless

vessel, all come from 1820 at the latest.  It is difficult to say whether those cases truly support a

broad reading of the Piracy Clause or whether they merely were interpreting the text of section 8

of an outdated statute, the Act of April 30, 1790.  *See United States v. Palmer*, 16 U.S. (3

Wheat.) 610, 630 (1818) ("The constitution having conferred on congress the power of defining

and punishing piracy, there can be no doubt of the right of the legislature to enaet [sic] laws

punishing pirates, although they may be foreigners, and may have committed no particular

offence against the United States.").

The second major problem with relying on the Piracy Clause to support

jurisdiction over this prosecution is the difficulty of establishing that drug trafficking fits within

the plain meaning of "piracy" as understood both in society at large and in the courts.  *See*, *e.g.*,

*Shi*, 525 F.3d at 721 ("'Piracy' traditionally has been defined as 'robbery, or forcible

depredations upon the sea.' *Smith*, 18 U.S. at 161.  'Depredation' is 'the act of plundering,

robbing, or pillaging.' All three acts require the use of force. . . . Because [offenses defined in 18 U.S.C. § 2280] involve interference with property on the open sea through the use of force, they are within Congress's power to define and to punish crimes of piracy." (some internal citations omitted)).

Thirdly, the Piracy Clause is a bad fit because establishing the jurisdiction of a United States federal court over a stateless vessel as a "pirate" would only establish the federal government's ability to criminalize the offense committed by the stateless vessel's crew. It would require a separate inferential step to hold Messrs. Munoz Miranda and Valderrama Carvajal responsible for "piracy" when they did not step aboard the vessel. Courts have struggled with the question of whether conspiracy to commit piracy is even an actionable offense. *See, e.g.*, *United States v. Ali* (*Ali I*), __ F. Supp. 2d __, Cr. No. 11-106, 2012 WL 2870263, at *10–11 (D.D.C. July 13, 2012) (applying *Charming Betsy* and dismissing conspiracy to commit piracy count), *vacated in part on other grounds on reconsideration*, *Ali II*, __ F. Supp. 2d __, 2012 WL 302476 (D.D.C. July 25, 2012), *appeal docketed*, No. 12-3056 (D.C. Cir. filed July 27, 2012).

For these reasons, the Court concludes that the Piracy Clause may not grant Congress the authority to criminalize the conduct charged here.

### iii.  Law of Nations

The Court next turns to the Law of Nations Clause, which grants Congress the power to "define and punish . . . Offences against the Law of Nations." U.S. Const. Art. I, § 8, cl. 10. The Law of Nations Clause is the focus of many of Defendants' arguments, especially in the context of their motion for reconsideration, because the Eleventh Circuit recently held that a MDLEA prosecution exceeded Congress's ability to criminalize conduct under the Law of

Nations clause.  *See Bellaizac-Hurtado*, 700 F.3d at 1247 ("[W]e conclude that drug trafficking

is not an 'Offence[ ] against the Law of Nations' . . . .").  The Defendants argue that *Bellaizac-*

*Hurtado* should be persuasive because it is a "sound decision" with "in depth analysis" that

"goes directly to the heart of the motion to dismiss" in this case.  Dkt. 84 at 3.  They adopt "all

reasoning presented in the *Hurtado* Opinion as to why the Offences Clause is limited by

customary international law and why drug trafficking is not an offense against the law of

nations."  Dkt. 84 at 5.

> DOJ responds that the Court should not address Defendants' arguments under the

Law of Nations Clause "because the Government has demonstrated a basis *other than* the Law of

Nations Clause to render the MDLEA's application to the Defendants constitutional under

Article I."  Dkt. 89 at 8; *see also* Dkt. 89 at 26 n.6 (arguing that the Court should not address the

Law of Nations clause because "the statute as applied to these Defendants is . . . constitutional

under the Felonies on the High Seas Clause of Article I § 8 cl. 10").

> Both parties have valid points.  Messrs. Munoz Miranda and Valderrama Carvajal

are correct to rely on *Bellaizac-Hurtado* as a factually similar case, to the extent that it involved a

seizure by a foreign country's authorities in that country's territory.  The background of that case

is as follows:

> During a routine patrol of Panamanian waters in 2010, the United
> States Coast Guard observed a wooden fishing vessel operating
> without lights and without a flag. The Coast Guard informed the
> Panamanian National Aero–Naval Service of the vessel. The
> Panamanian Navy pursued the vessel until its occupants abandoned
> the vessel and fled into a jungle. . . . The Panamanian National
> Frontier Service . . . arrested [the defendants] in various locations
> on the beach and in the jungle.

700 F.3d at 1247–48.

But DOJ is correct also.  The *Bellaizac-Hurtado* court's opinion is limited to the

Law of Nations clause.  *See* 700 F.3d at 1247 ("This appeal presents a novel issue about the

scope of congressional power to proscribe conduct abroad: whether the [MDLEA] exceeds the

power of Congress to 'define and punish . . . Offences against the Law of Nations,' U.S. Const.

Art. I § 8, cl. 10, as applied to . . . drug-trafficking activities . . . in the territorial waters of

Panama.").  The Eleventh Circuit made that point several times, emphasizing:

> The first two grants of power are not implicated here: piracy is, by
> definition, robbery on the high seas, *United States v. Furlong*, 18
> U.S. (5 Wheat.) 184, 198 (120), and the Felonies Clause is
> textually limited to conduct on the high seas, *see* U.S. Const., Art. I
> § 8, cl. 10.  The United States relies instead on the third grant—the
> Offences Clause—as the source of congressional power to
> proscribe the defendants' drug trafficking in the territorial waters
> of Panama.

700 F.3d at 1248–49; *see also id.* at 1258 (observing that the government had not argued "any

alternative ground upon which the Act could be sustained as constitutional").  Because *Bellaizac-*

*Hurtado* is limited to the Law of Nations Clause and because the Court concludes that Congress

had the authority to criminalize the Defendants' conduct under the Felonies on the High Seas

Clause, the Court does not address the Law of Nations Clause in depth.

### iv.  Felonies on the High Seas

The Court now turns to Congress's power to "define and punish . . . Felonies on

the high Seas."  U.S. Const. Art. I § 8, cl. 10.  Courts have upheld MDLEA prosecutions under

this clause before, although every case of which the Court is aware involves facts slightly distinct

from those presented here.  Those factual distinctions can be broken into two separate questions

that the Court must answer:  (1) Does jurisdiction under the Felonies on the High Seas Clause

turn on exclusively on where the vessel was apprehended, making it significant that the vessel

was seized in foreign territorial waters despite having traveled on the high seas?; (2) Does it

matter that these defendants were not on the vessel at any time, including at the time of seizure?

The Court briefly reviews the cases upholding prosecutions under the Felonies on the High Seas

Clause before answering those two questions.

Some MDLEA cases have limited their analysis to the Felonies on the High Seas

Clause.  The lead case is *United States v. Davis*, 905 F.2d 245, 247 (9th Cir. 1990), in which the

Ninth Circuit addressed interdiction of a vessel by the United States Coast Guard "35 miles

southwest of Point Reyes, California," and seizure "100 miles west of the California coast."  The

*Davis* court held:

> The Constitution gives Congress the power to "define and punish
> piracies and felonies on the high seas . . . ."  U.S. Const. Art. I § 8,
> cl. 10.  The high seas lie seaward of the territorial sea, defined as
> the three mile belt of sea measured from the low water mark.
> *United States v. Rubies*, 612 F.2d 397, 402 n.2 (9th Cir. 1979).  We
> therefore find that the Constitution authorized Congress to give
> extraterritorial effect to the Act.[16]

*Id.* at 248.

The Ninth Circuit reaffirmed *Davis* in *United States v. Moreno-Morillo*, 334 F.3d

819, 834 (9th Cir. 2003), in which it cited *Davis* and held: "As an exercise of congressional

power pursuant to Article I, Section 8, Clause 10, this court clearly has held that the MDLEA is

constitutional."  Addressing an argument "that drug-trafficking is not among the felonies and

piracies on the high seas that Congress is empowered to define under Article I, Section 8, Clause

10," the *Moreno-Morillo* court held that the Ninth Circuit had previously "held otherwise."  334

F.3d at 824.   ("In *United States v. Aikins*, 946 F.2d 608 (9th Cir. 1990), this court found that the

MDLEA 'expressly prohibits the possession of drugs on certain vessels with intent to distribute'

and, citing *Davis*, further found that such a prohibition was within Congress 'power to define and

---

[16] As set forth above, this Court concludes that the "territorial seas" begin at twelve miles, not
three.

punish piracies and felonies committed on the high seas.' *Id.* at 613." (one set of internal

quotation marks omitted)).

Outside the MDLEA context, the Ninth Circuit has upheld other statutes on the

basis of the Felonies on the High Seas Clause.  For example, in *United States v. Shi*, it held that

"[18 U.S.C. ]§ 2280[, prohibiting acts of violence endangering maritime navigation,] is an

exercise of Congress's constitutional authority to define and punish 'Felonies on the high Seas'

because it proscribes felony offenses and expressly applies to international waters."  525 F.3d at

721.

### a.  Does jurisdiction turn on where the vessel was apprehended?

The first question is whether the Felonies on the High Seas Clause only applies to

vessels *seized* on the high seas.  That, of course, was not the case here; the vessel was seized in

Colombia's territorial waters.  Defendants assert "that the location of where the vessel was

seized is of utmost concern for this Court in ruling on their motion."  Dkt. 95 at 2.  Messrs.

Munoz Miranda and Valderrama Carvajal contend that "for a district court to have adjudicatory

authority over a charge that a defendant conspired to violate [46 U.S.C. § 70503(a)], the

Government must preliminarily show that the conspiracy's vessel was, *when apprehended*,

'subject to the jurisdiction of the United States.'"  Dkt. 91 at 3 (quoting *United States v. De La

Garza*, 516 F.3d 1266, 1272 (11th Cir. 2008)).  According to the Defendants, "where the boat

was seized and by whom" is the only inquiry that matters; "there is no need to establish the route

of travel and whether the vessel in question traversed the high seas."  Dkt. 95 at 3.  Policy

considerations and principles of international law favor their interpretation, Defendants argue,

because "[i]t was the stateless vessel navigating upon the high seas that was beyond any

nation[']s drug laws.  As [stateless vessels] belong to no nation, thus no nation could enforce its

drug laws upon them, and they were beyond the territorial waters of a nation, thus again placing them beyond the reach of a nation[']s law." *Id.* at 5.  In Defendants' view, once a vessel, even a stateless vessel, is in a nation's territorial waters, it is for that nation alone to enforce its laws.  *Id.*

Where the vessel is ultimately seized does not matter, DOJ argues, because "a vessel without nationality *which first traverses the high seas*, before being stopped within another country's territorial waters, is an international pariah rightfully subject to the jurisdiction of the United States under the MDLEA and the High Seas Clause of Article I."  Dkt. 89 at 23.  DOJ asserts that its interpretation is most consistent with the "plain language of . . . the High Seas Clause[,] which permits Congress '[t]o define and punish . . . Felonies *committed on* the high Seas." *Id.* at 24 (emphasis added by government).  According to DOJ, a contrary constitutional interpretation would "lead to the absurd result of drug traffickers virtually operating with impunity from prosecution for drug smuggling on the high seas, as long as the crew and its vessel could successfully make a run for the territorial waters of a foreign country before being stopped by maritime enforcement authorities." *Id.*; *see also* Dkt. 97 at 8–11 ("Simply put, the enforcement of the MDLEA on the high seas must not depend on whether a foreign country can, or does in fact, prosecute the vessel's crew because the crew and its vessel ultimately made it to a foreign country's territorial seas where they were interdicted.").

This issue is one that courts have recognized at least twice before but have not resolved.  In one such case, involving a vessel seized very near the Bahamas, the Eleventh Circuit reasoned that the vessel was stateless and seized in international waters.  *United States v. McPhee*, 336 F.3d 1269, 1272 (11th Cir. 2003).  Accordingly, the *McPhee* court did "not answer the more difficult questions of whether the Bahamian Government consented to the enforcement of American law by the United States in the territorial waters of the Bahamas, or whether the

United States had jurisdiction to seize a stateless vessel without consent, within Bahamian

territorial waters." *Id.* at 1273.  Another case, from the Third Circuit, involved a vessel captured

"a short distance south of Saba Island, which is part of the Netherlands Antilles and is located

east of St. Croix." *Rosero*, 42 F.3d at 167–68.  Without significant analysis, the *Rosero* court

held: "While the [vessel] may not have been on 'the high seas' when it was stopped near Saba,

there was ample evidence, including the statement of the crew members that the ship had

departed from Barranquilla, Colombia, to show that a violation of 18 [sic] U.S.C. App. § 1903(a)

had occurred on 'the high seas.'"  42 F.3d at 169 n.1.

   The Court concludes that forcing MDLEA jurisdiction to turn on a vessel's

location at the time of seizure is inconsistent with the plain text of the Felonies on the High Seas

Clause and would elevate form over substance.  The Felonies on the High Seas Clause contains

no jurisdictional limitation and imposes no requirement as to where a vessel or criminal

defendant be seized to be subjected to United States jurisdiction.  The clause is simple; it permits

Congress to criminalize and exert its authority over "felony offenses" in "international waters."

*Shi*, 525 F.3d at 721.  At a bare minimum, the conduct in this case came within the scope of the

Felonies on the High Seas Clause when the stateless vessel employed by the conspiring members

of the DTO, carrying cocaine, left the northern coast of Colombia and entered the high seas.[17]

Ultimately, the place of seizure is irrelevant to the Court's jurisdiction once the Defendants were

brought to this country inasmuch as the Court finds that the vessel in question traveled on the

high seas.

---

[17] The Court expresses no opinion as to whether prosecution would be a valid exercise of power
under the Felonies on the High Seas Clause if the vessel had never left Colombian territorial
waters in the first place, which, apparently, is an issue before the Eleventh Circuit on the petition
for rehearing in *Bellaizac-Hurtado* (concerning Panama).

The legislative history of MDLEA and the logic articulated by the United States

in its petition for rehearing *en banc* in *Bellaizac-Hurtado* support this conclusion.  The

legislative history of MDLEA reflects Congress's awareness of the ever-evolving nature of

international drug trafficking, including traffickers' exploitation of quirks of international law.

*See* S. Rep. No. 96-855 at 2785–86.  Those concerns remain present; "[i]n the last few years,"

enforcement "at the margins of Congress's larger regulatory scheme" has become "even more

critical, because 'traffickers have shifted from high seas routes to multistaging tactics along the

Central American littorals [i.e., shorelines], attempting to evade international interdiction

efforts.'"  Pet. Rehr'g, *United States v. Bellaizac-Hurtado*, No. 11-14049-HH (11th Cir. filed

Jan. 11, 2013), at 13–14 (quoting Dep't Def. Auth. for Approps. for Fiscal Year 2010: Hrgs.

Before S. Comm. Armed Servs., 111th Cong. 10 (2009) (statement of Adm. James G. Stavridis);

other citations omitted).  Although the government seeks a broader grant of authority in

*Bellaizac-Hurtado* because there is no evidence that the vessel at issue there left territorial

waters, its citation to *Gonzales v. Raich*, 545 U.S. 1 (2005), is illustrative.  In *Raich*, the Supreme

Court accepted that some purely intrastate activity could be regulated as part of Congress's

efforts to regulate interstate trafficking in marijuana pursuant to its Commerce Clause power.  *Id.*

at 17 ("Our case law firmly establishes Congress' power to regulate purely local activities that

are part of an economic 'class of activities' that have a substantial effect on interstate

commerce.")  By analogy, MDLEA's application here is valid under the Felonies on the High

Seas Clause because it "reflects Congress's reasonable determination that its regulation of drug-

trafficking activity on the high seas would be undermined," Pet. Rehr'g 12–13, if the United

States could not prosecute a felony on the high seas merely because the seizure and/or some part

of the offense took place on foreign territorial seas.

The Court concludes that Congress's authority to criminalize conduct under the Felonies on the High Seas Clause of Article I § 8 of the Constitution does not depend on where a vessel is seized, although it may be tempered by foreign relations executed by the Executive.

### b. Does the Felonies on the High Seas Clause Extend to Conspiracy?

The final question is whether the conspiracy with which Defendants are charged—conspiracy to distribute narcotics on board a stateless vessel—is a "felony on the high Seas" within the meaning of the Felonies on the High Seas Clause. Put another way, can Congress criminalize the Defendants' conduct even though they never were on the high seas themselves?

Messrs. Munoz Miranda and Valderrama Carvajal argue insistently that they "have been unable to locate *any* prosecutions of individuals under 46 U.S.C. § 70503, who were not actually on board, or very recently on board (i.e. fleeing) a vessel. Typically, the charge, including conspiracy to commit the charge, is brought against the captain and crew of vessels on the high seas, or with consent of the flag nation[, a]lmost always where American authorities have participated in the seizure of the vessel." Dkt. 53 at 3; *see also* Dkt. 51 at 2 n.1 ("[I]n all the cases cited by the government, the defendants charged with [violating 46 U.S.C. § 70503] were always the crew members on board the vessel, not individuals on land[ ] who never even observed the vessel. The defendants never saw the vessel nor knew anything about the seized vessel. They had no control or knowledge of how the crew handled the vessel and its nationality."). According to the Defendants, "[t]he government cannot assert jurisdiction over an entirely extraterritorial conspiracy[ ] where none of the alleged conspirators are United States citizens or residents, none of the overt acts occurred in the United States, and there was no nexus

between the conduct alleged and the United States."  Dkt. 91 at 2 (citing *United States v. MacAllister*, 160 F.3d 1304 (11th Cir. 1998)).

DOJ relies on the "well-established legal principle that 'the basic character of a conspiracy [is one of] a continuing crime involving conduct over a period of time and, very often, in more than one place.'"  Dkt. 97 at 12 (quoting *United States v. Baltimore & O.R.R.*, 538 F. Supp. 200, 204 (D.D.C. 1982)).  DOJ contends that the "Court should not restrict the Government's ability to establish subject matter jurisdiction for a continuing crime such as conspiracy" because to do so would "not only be inapposite to the basic [tenets] of conspiracy law and the statutory language itself, but to other U.S. law which grants venue to offenses 'begun' or 'committed' on the high seas."  Dkt. 97 at 12–14 (citing, *inter alia*, 18 U.S.C. § 3238 (catch-all venue statute)).

It must be recognized that the Defendants have a point.  Most MDLEA cases involve defendants who were on board a vessel in international waters at the time of seizure by the United States Coast Guard.  *E.g.*, *Moreno-Morillo*, 334 F.3d at 822 (MDLEA prosecution of "Colombian nationals who were on board a vessel in international waters approximately 200 miles southwest of Acapulco, Mexico").  But DOJ's prior prosecutorial practices do not make constitutional law; the question the Court must answer is whether the Constitution permits criminalization of the offenses charged in this case.  The Court concludes that it does.  Notably, conspiracy was recognized as an offense in England well prior to the drafting of the United States Constitution.  *See, e.g.*, *State v. Buchanan*, 5 H. & J. 317, 334–36 (Md. 1821) (discussing common law history of conspiracy back to time of King Edward I and observing: "Who doubts, or was it ever questioned, that a conspiracy to commit any felony is an indictable offence; as to rob or murder, to commit a rape, burglary or arson, &c. or a misdemeanor, as to cheat by false

62

public tokens, &c?").  Thus, although MDLEA may be an innovation of the late 20th century, conspiracy as part of criminal law existed at the time the Constitution was written.

Most importantly, it is well established in conspiracy law that "the overt act of one partner in crime is attributable to all."  *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).  "As long as a substantive offense was done in furtherance of the conspiracy, and was reasonably foreseeable as a 'necessary or natural consequence of the unlawful agreement,' then a conspirator will be held vicariously liable for the offense committed by his or her co-conspirators."  *United States v. Washington*, 106 F.3d 983, 1012 (D.C. Cir. 1997) (quoting *Pinkerton*, 328 U.S. at 647–48).  For the reasons set forth above, the Court has concluded that these conditions are met here.  Defendants' co-conspirators committed a substantive offense, possession of narcotics on board a stateless vessel on the high seas, which indisputably would be both within this Court's jurisdiction and the ambit of the Felonies on the High Seas Clause.  Defendants have not argued that this offense was not a foreseeable consequence of the conspiracy; to the contrary, moving cocaine from Colombia to a rendezvous point off Honduras through a stateless vessel on the high seas was an integral part of the charged conspiracy.  Messrs. Munoz Miranda and Valderrama Carvajal are chargeable with the conduct of their co-conspirators aboard the stateless vessel, and the Court concludes that their conduct in Colombia is within Congress's authority to define as a felony on the high seas.[18]

This conclusion is buttressed by the reasoning of one of the few cases to present similar facts, *United States v. Medjuck*, which involved MDLEA charges against various members of a multinational conspiracy.  In that case, the district court reasoned that the acts of

---

[18] The case cited by Defendants, *United States v. MacAllister*, is not on point.  In that case, the court found jurisdiction based on the objective territorial principle because the defendant, a Canadian, was a member of a conspiracy in which conspirators "committed acts in furtherance of the conspiracy within the territorial boundaries of the United States."  160 F.3d at 1307.

Medjuck's agents in the United States, such as securing a vessel and paying its crew, could be imputed to Medjuck. 937 F. Supp. at 1389 ("When one agrees to be a member of a conspiracy, one agrees to all acts that have been or will be committed by that conspiracy, and, by virtue of that agreement, is responsible for such acts regardless of one's role in the commission." (quoting *United States v. Inafuku*, 938 F.2d 972, 974 (9th Cir. 1991)). This Court agrees.

### v. Conclusion

This prosecution is a valid exercise of Congress's authority to "define and punish . . . Felonies on the high Seas." U.S. Const. Art. I § 8, cl. 10. Because application of MDLEA to these circumstances is not beyond Congress's powers under the Constitution, the Court turns to Defendants' final argument—that the prosecution violates due process.

### F. Due Process

The final question is whether the prosecution of Messrs. Munoz Miranda and Valderrama Carvajal violates their due process rights under the Fifth Amendment. The relevant legal standard is an issue currently on appeal to the D.C. Circuit.

Courts have analyzed due process challenges to extraterritorial application of U.S. criminal statutes under different standards, even within the limited body of MDLEA case law. First are the MDLEA cases. The D.C. Circuit has not ruled on this issue, but several circuits "treat[] defendants apprehended aboard stateless vessels differently from those apprehended aboard foreign-flag ships for the purposes of this 'nexus' analysis. With respect to those apprehended aboard foreign-flag vessels, there must be some nexus to the United States before jurisdiction can be established; there is no such requirement for defendants aboard stateless vessels." *Moreno-Morillo*, 334 F.3d at 828 (citations omitted); *see also Caicedo*, 47 F.3d at 371–72 (observing that cases with "defendants apprehended on foreign flagged vessels" get "radically different treatment" from cases involving stateless vessels). In the circuits drawing

such a distinction, the United States must show a "sufficient nexus between the defendant and the United States," *Davis*, 905 F.2d at 248–49, to proceed with respect to a foreign-flagged vessels. *See also Caicedo*, 47 F.3d at 372 ("As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests."). But, when the prosecution involves a stateless vessel, "a showing of statelessness effectively moots the nexus requirement because those aboard stateless vessels effectively have waived their right to object to the exercise of jurisdiction over them by United States courts." *Moreno-Morillo*, 334 F.3d at 828; *see also Pinto-Mejia*, 720 F.2d at 260–61 ("[A] stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity. . . . [W]e find no authority in international law for requiring any nexus where the ship otherwise would be subject to the jurisdiction of no state.").

Other circuits eschew the stateless/flagged vessel distinction, stating that the United States can criminalize conduct on a foreign-flag vessel even without any nexus to the United States. *See Martinez-Hidalgo*, 993 F.2d at 1056 & n.6 (3d Cir.) (rejecting *Davis* and holding that no nexus requirement should be imposed regardless of the flag-status of the vessel because there is "nothing fundamentally unfair in applying section 1903 exactly as Congress intended—extraterritorially without regard for a nexus between a defendant's conduct and the United States.").

Courts differ as to the test to apply outside of the context of MDLEA. For example, the Second Circuit in *Yousef*, addressing conspiracy to bomb aircraft, applied the nexus test from the Ninth Circuit's *Davis* opinion addressing foreign-flagged vessels. *See Yousef*, 327

F.3d at 111–12 (quoting *Davis*, 905 F.2d at 248–49, and holding that "given the substantial

intended effect of their attack on the United States and its citizens, it cannot be argued seriously

that the defendants' conduct was so unrelated to American interests as to render their prosecution

in the United States arbitrary or fundamentally unfair.").  Recently, the Fourth Circuit held that

due process was not violated in the prosecution of a South African national who assaulted a

British national while at Kandahar Airfield in Afghanistan because:

> Fair warning does not require that the defendants understand that
> they could be subject to criminal prosecution in the United States
> so long as they would reasonably understand that their conduct was
> criminal and would subject them to prosecution somewhere. The
> defendants were not ensnared by a trap laid for the unwary.

*United States v. Brehm*, 691 F.3d 547, 554 (4th Cir. 2012) (quoting *United States v. Al Kassar*,

660 F.3d 108, 119 (2d Cir. 2011)), *cert. denied*, 133 S. Ct. 808 (Dec. 10, 2012).

Finally, and perhaps most importantly, a case involving the due process test for

extraterritorial application of a federal criminal statute is currently pending before the D.C.

Circuit.  *United States v. Ali*, No. 12-3056 (D.C. Cir. filed July 27, 2012).  The district court in

*Ali I* acknowledged the split in authority and stated that the question it faced in a prosecution for

piracy and hostage taking was whether extraterritorial application was "arbitrarily or

fundamentally unfair" because the defendant "had no reasonable expectation of being tried" in

the United States.  *Ali I*, 2012 WL 2870263, at *17.  The district court then added: "The better

articulation may be that whatever the Due Process Clause requires, it is satisfied where the

United States applies its laws extraterritorially pursuant to the universality principle." *Id.* at *18.

The court found its standard met because "the hostage taking charges allege[d] the same high-

seas conduct for which [the defendant was] lawfully subject to prosecution for piracy" and

because of the United States had notified the world community that it intended to prosecute

66

hostage taking in its courts even absent a nexus to the United States by ratifying the International

Convention Against the Taking of Hostages. *Id.* at *18.

   The *Ali* court reversed itself in part twelve days later when the government

admitted "it had scant evidence to show that Ali aided and abetted the pirates while he was on

the high seas," a fact that had figured prominently in the Court's conclusion that Ali's due

process rights were not infringed by prosecution in the United States. *Ali II*, 2012 WL 3024763,

at *2. Thereafter, the *Ali* court concluded that prosecuting him for hostage taking would not "be

consistent with his Fifth Amendment due process rights," under any of the various due process

tests. *Id.* at *4–5. The government filed an interlocutory appeal as to both of the *Ali* court's

rulings, and the D.C. Circuit held oral argument on November 19, 2012. Because the due

process issue was briefed, the D.C. Circuit's ruling may elucidate the approach district courts in

this circuit should follow.

   Given the conflicting guidance of the cases discussed above, the Court concludes

that its best course is to employ the common denominator: whether application of MDLEA to

Messrs. Munoz Miranda and Valderrama Carvajal is arbitrary or fundamentally unfair. *See Ali I*,

2012 WL 2870263, at *17 ("[T]his difference is less real than apparent. . . . [T]he ultimate

question is whether application of the statute to the defendant [is] arbitrary or fundamentally

unfair." (citations and internal quotation marks omitted)).

   Their prosecution violates due process, Defendants argue, because "there is no

allegation that the drugs seized by the Colombian Navy in this case were destined for the United

States, or that the case bears any relationship at all to the United States. All acts took place

overseas and the vessel in question was seized in the territorial waters of Colombia. The

defendants, Colombian national[s,] were arrested in Colombia for the offenses in this case." Dkt.

51 at 1.  According to Defendants, "[p]ersons who live in Colombia and do not export drugs to the United States[ ] have no reason to expect to be haled before a United States District Court." Dkt. 91 at 5.  Because the stateless vessel is the connection to the United States's jurisdiction, the Defendants note that DOJ has conceded that the Defendants "were not on the boat at the time of the seizure" and that there is no evidence "that the defendants had at any time seen the boat, approached the boat, loaded the boat, etc."  Dkt. 95 at 2.  Moreover, because "[t]his case was investigated by Colombian authorities, using Colombian law to justify telephone wiretaps" and "[t]he drugs were seized by Colombian authorities and tested by procedures that are not acceptable in the United States," the Defendants also argue that United States authorities have been handed a case that may have been investigated and prepared in a foreign justice system with different procedural and substantive protections for Defendants.[19]  Dkt. 53 at 4–5.

DOJ responds that "the defendants can hardly argue that they were not aware of the possibility of being hauled into [a] U.S. court, or any other country's court, by virtue of their use of [a] stateless vessel to smuggle drugs in the international or territorial waters that breach the span between the northern coast of Colombia and the islands of Roncador and San Andres, or Honduras for that matter.  Their use of a vessel carrying no flag, documentation, markings, large amounts of fuel, etcetera, reinforce[s] their knowledge of engaging in conduct as prohibited by the international community, not just Colombia."  Dkt. 60 at 24–25.  Furthermore, "the Colombian government's granting of the extradition is analogous to a foreign nation granting the U.S. jurisdiction over a foreign flagged vessel, such that when the consent is given, it 'eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair.'" Dkt. 60 at 38 (citing, *inter alia*, *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999)).

---

[19] Defendants' guilty pleas, conceding involvement in drug trafficking, undermine this assertion.

The Court concludes that this prosecution is neither arbitrary nor fundamentally unfair and there is no due process violation.  Although the Defendants were not aboard the stateless vessel when it was seized, their use of it represents an "attempt to avoid the law of all nations," and they have "forfeited [the] protections of international law and can be charged with the knowledge that [they] ha[ve] done so." *Caicedo*, 47 F.3d at 372–73.  Indeed, in recent years "traffickers have shifted from high seas routes to multistaging tactics along the Central American littorals [i.e., shorelines], attempting to evade international interdiction efforts." *Bellaizac-Hurtado* Pet. Rehr'g at 13–14 (quoting Dep't Def. Auth. for Approps. for Fiscal Year 2010: Hrgs. Before S. Comm. Armed Servs., 111th Cong. 10 (2009) (statement of Adm. James G. Stavridis).  These defendants were on notice that, by using a stateless vessel to transport narcotics across the high seas, they were opening themselves to the possibility of prosecution.  As part of a sophisticated drug trafficking organization that was responsible for transporting large amounts of cocaine and as evidenced by their attempts to avoid detection and interdiction, there can be no doubt that Defendants knew their actions were illegal and subject to prosecution.  Moreover, Colombia's extradition demonstrates approval of the United States's criminal proceedings against Defendants.  Such extradition is neither new nor unknown to Colombian drug traffickers.

Thus, the Court finds that Defendants—large-scale Colombian drug-traffickers—cannot have been surprised by United States prosecution.  Therefore, there is no due process violation.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that it has statutory subject matter jurisdiction over the offenses charged in this case, that MDLEA as applied here is a valid exercise of Congress's authority to criminalize conduct under the Felonies on the High Seas

Clause, and that there is no due process violation.  The Court thus reaffirms its denial of the

motions to dismiss filed by Messrs. Munoz Miranda and Valderrama Carvajal.  A memorializing

Order accompanies this Opinion.

DATE: February 20, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
